OPINION OF THE COURT
J. Robert Lynch, J.
On May 5, 1980, 15-year-old Daniel Harris was grievously burned in a farm tractor accident. His father Arthur, individually and on the boy’s behalf, and his mother commenced an action to recover damages against International Harvester, which manufactured the tractor, and White’s Farm Supply, its retailer. These defendants brought a third-party action against Agway Petroleum Corporation which supplied the tractor’s gas *427 oline. International Harvester, alleging his negligence, counterclaimed against the father. The original plaintiffs brought a primary action against Agway and the father also brought a fourth-party action against Agway. The latter counterclaimed against the father and also against International Harvester.
The plaintiffs’ actions have been settled. In the settlement agreement the parties remaining — International Harvester, Agway, White’s Farm Supply, and Arthur Harris — agreed that this court should determine after a nonjury trial the percentage, if any, of each party’s liability for the settlement amount, with the understanding that no negligence or culpable conduct would be attributed to the son Daniel Harris.
Prior to and during the trial, there were objections and motions upon which decision was reserved. To the extent that the court’s ruling on these may not be inherent in our decision, a ruling is specifically made in an appendix following the determination of apportionment.
THE ACCIDENT
On November 25,1968 Arthur Harris purchased from White’s Farm Supply a Farmall F656 tractor that had been manufactured by International Harvester on June 14, 1967. Harris had long been a customer of White’s; he had long been a buyer and user of International Harvester tractors. He had long been a customer for Agway Petroleum Corporation’s gasoline. Agway would deliver it to his farm, putting it in his 1,000-gallon underground tank. The last delivery prior to the accident was for 811 gallons on April 24,1980. The penultimate delivery was for 800 gallons on March 13th, and before that, for 805 gallons on January 18th.
On the date of the accident, May 5th, Arthur Harris fueled the tractor and began working it at 1:00 p.m. It was spring plowing, arduous for the tractor. The day was warm. (At Hancock Airport, 50 miles to the west, the afternoon temperatures ranged from 75 to 84 degrees.) While plowing, Arthur Harris noticed that at times the tractor engine would seem to hesitate; at times black smoke would come from its exhaust. He knew that pressure had built up in the fuel tank — the tank was in front of him at the top of the tractor between him and the engine — because there was hissing from the vent hole in its fuel cap. About 4:30 Arthur turned the tractor over to his son, Daniel. He told him the tractor needed refueling and to continue plowing. He did not tell him of the pressure in the fuel tank.
Daniel fueled the tractor from the underground tank and plowed until about 6:40 p.m. Then he stopped the tractor because *428 there was hissing from the fuel tank vent cap. He too thought it an indication of pressure buildup in the tank. With the engine running and hot, Daniel loosened the cap, intending to relieve the pressure. As he loosened it, pressure forced it off the filler neck. Gasoline erupted out, geysering about eight feet into the air. Some of the gasoline got on Daniel’s chest and arms. Jumping off the tractor, he stood aside for several seconds until the gasoline stopped erupting from the fuel tank. He climbed back on and was starting to replace the cap when a fire ignited. He was extensively burned.
AS TO INTERNATIONAL HARVESTER
Agway seeks to join International Harvester in the apportionment of liability on the ground of negligence. It alleges faulty design or manufacture of the tractor, causing heated fuel to geyser, spray, and ignite were the fuel cap removed. It alleges that International Harvester was aware of this defect and neither corrected it nor gave notice of it to its tractors’ users. Arthur Harris, complaining of the same condition, seeks to hold International Harvester in the apportionment on the grounds of negligence and strict liability.
The F656 tractor is equipped with a solid metal heat shield between the engine and the fuel tank. It is designed to provide an insulating air layer between itself and the engine and another between itself and the fuel tank, thus impeding heat transfer to the tank from fan blast, engine heat, and the exhaust system including the manifold. The shield is affixed by bolts to a rigid frame to make it nonadjustable.
At the time of the accident, the heat shield of Harris’ F656 was in physical contact with the lower anterior position of the fuel tank. It had not been distorted or warped and, although it had been removed for service and maintenance of the tractor, there is no evidence that its position had been changed on reinstallation. We conclude, therefore, that the physical contact was the result of factory installation.
The area of physical contact is in dispute. Agway says 56 square inches; International Harvester says two square inches of metal-to-metal contact with 20 to 38 square inches of rust and field debris compacted between. We find the issue of minimum significance. Any metal-to-metal contact would foreseeably result in a buildup of rust and debris compaction and tend to defeat the insulation design.
Since 1950 International Harvester had been aware of the possibility of fire from gasoline spurting from the fuel tanks of *429 its tractors. Since 1942 it had been aware of pressure buildup in its tractor fuel tanks caused by the use of winter grade gasoline on warm spring days. A 1955 International Harvester report indicates tractor owners being sprayed with gasoline upon removing a fuel cap when there was pressure buildup in the fuel tank. Other evidence proves: that during the 1950’s and 1960’s International Harvester was aware of problems with pressure buildup in various of its models; that it experimented with fuel tank insulation as early as 1956; that it had considered, and discarded for valid reasons based on business judgment, plans to change the fuel tank’s position away from engine-generated heat; that it was aware that the fan blast temperature on the F656 was the highest of nine compared models.
Against this known potential danger of fuel geysering or spurting, International Harvester is entitled to have measured the “burden of the precaution which would be effective to avoid the harm” (Micallef v Miehle Co., 39 NY2d 376, 386). To this end, International Harvester conducted research and tests of new fuel caps, different methods of venting the fuel tank, relocation of the tank, and insulation of the tank and heat shield. In 1969, it concluded that the tank’s absorption of heat could be significantly reduced by insulation. In 1970, two years after Arthur Harris had bought his tractor, it sent a service bulletin to its dealers announcing the availability of an insulation package for the F656 heat shield. Neither it nor White’s Farm Supply informed Arthur Harris of the package.
We find that International Harvester created a dangerous condition when it manufactured the Harris tractor with its heat shield in contact with the fuel tank. We find also that International Harvester, knowing the problems of fuel pressure buildup arising from the use of an inappropriate grade of gasoline in tractors in which the heat shield presumably was correctly installed, could have mitigated, if not completely corrected, the Harris tractor’s problem by giving Arthur Harris notice of the availability of the insulation package. We conclude that International Harvester was negligent, that its negligence was a producing cause of the accident, and that it should share in the apportionment.
AS TO WHITE’S FARM SUPPLY
Arthur Harris, identifying White’s as the retailer of the tractor, makes the same complaint as he did against International Harvester; the defect in the tractor and the failure to correct it or notify him of it. He seeks to join White’s in the apportionment of liability on the grounds of negligence and strict liability.
*430 As a retailer White’s had a duty to discover defects that an ordinary inspection would have disclosed (Naples v City of New York, 34 AD2d 577). An ordinary inspection — indeed, a trained mechanic’s casual look — should have disclosed the defect of the heat shield being in contact with the fuel tank it was meant to shield. If nonfeasance can be compounded, it was when White’s, given the opportunity to correct the defect when it removed the shield to service the tractor, replaced it in its original position.
A retailer also has a duty to warn of known dangers in the use of a product (47 NY Jur, Products Liability, § 35; 1 Weinberger, New York Products Liability § 18.18), even as to defects discovered after the sale (1 Weinberger, id,., § 18.15). The duty to warn runs not only to the purchaser but also to “third persons exposed to a foreseeable and unreasonable risk of harm by the failure to warn” (McLaughlin v Mine Safety Appliances Co., 11 NY2d 62, 68, 69). White’s breached its duty by not informing Arthur Harris of the availability of the heat shield insulation package. Although White’s had never received complaints from any of its customers of fuel pressure, it was aware of the prevalence of the problem through literature from International Harvester.
We conclude that White’s was negligent, that its negligence was a producing cause of the accident, and that it should share in the apportionment of liability.
AS TO AGWAY
International Harvester and White’s Farm Supply would bring Agway into the liability apportionment on allegations of its negligence, strict liability and breach of implied warranty. Agway asserts affirmative defenses against the latter two causes of action: that these third-party plaintiffs cannot establish strict liability as they were not users of its gasoline; that, as to implied warranty, they had no privity or other “jurai relationship” with Agway. Arthur Harris would bring Agway into the apportionment, alleging negligence, strict liability and breach of implied warranty.
At this point it should be understood that regular leaded gasoline is not of a constant formulation throughout the year or throughout the country. It varies according to the ambient temperature to be expected when the gasoline is to be used. Colder temperature demands higher volatility gasoline; warmer temperature, lower volatility. Thus, gasoline to be used in the northeast in winter has a higher volatility than that sold in the south. Gasoline to be used in the northeast in the warmer months has a lower volatility than that sold in the northeast in the colder months. Broadly stated, it is the complaint against *431 Agway that it delivered to Arthur Harris winter grade gasoline in late April knowing it would be used in May, a month requiring summer grade, and that this negligence was a producing cause of the accident.
Although one witness testified that the gasoline supplied by Agway to Arthur Harris was refined in Lake Charles, Louisiana, the parties have stipulated that it was refined in Texas by Texas City Refining, a corporation two thirds owned by Agway. It was shipped via Colonial Pipeline to a Cities Service storage facility in Linden, New Jersey, having been commingled along the way with presumably similar gasoline from other sources. The commingled product was then shipped from Linden via Buckeye Pipeline to an Agway storage facility in Marcy, New York, without further commingling. Agway then delivered it to local retail outlets and to individual customers like Arthur Harris.
Ten days after the accident, engineers from International Harvester went to the Harris farm and collected gasoline samples from his underground storage tank, from the fuel tank of the F656, and from its carburetor. The samples were sent to the R. E. Davis Chemical Company for analysis of the gasoline’s volatility. This is the only analysis we have of that gasoline nearest in chronology to the accident.
Much trial time was devoted to an issue of the more accurate measure of gasoline volatility, gas chromatography or the Reid Vapor Pressure test, the former being the method used by the Davis Chemical Company to measure the volatility of the samples sent it. While we find gas chromatography the more accurate, to avoid obfuscation we eschew explication because the issue is academic. Gas chromatography was the only test performed on the samples most proximate to the accident and the Reid Vapor Pressure tests were performed on samples having little relation to the suspect gasoline. To illustrate, Agway provided an analysis of an April 1980 sample from Linden, New Jersey, showing a Reid Vapor Pressure (RVP). We will discuss this sample later. Suffice it to say here that it was of a one-gallon sample taken from one of 32 tanks storing millions of gallons of gasoline. Agway also offered evidence of a gasoline volatility report by Chas. Martin Laboratories. This was from a sample taken from an Agway storage tank six weeks prior to the accident, but, in the interim, Agway had taken in 1,712,000 gallons of gasoline. We find no dependable evidentiary link between these samples and the gasoline used in the Harris tractor.
*432 Measurement of volatility by gas chromatography produces a result typically 5 to 10% higher than that obtained by the Reid test. The Davis Chemical Company measured the volatility at 15.5 pounds per square inch (psi). (This would be lower than at the time of the accident because the gasoline would have “weathered” between the dates of the accident and. the sample taking.) We reduce this gas chromatography measurement by 10% to reach Reid Vapor Pressure and we do this only because Agway’s contractual specifications are expressed in RVP. Thus, we find that the gasoline used in the Harris tractor the date of the accident had an RVP of at least 13.9 psi.
A gasoline of such volatility represents a breach of Agway’s purchasing agreement with its supplier, Agway’s in-house specifications, and the standards of the American Society of Testing Materials (ASTM) upon which the purchasing agreement and in-house specifications are based. The Agway-Texas City Refining purchase agreement requires adherence “to the specifications for like products of Cities Service Oil Co.” While the latter specifies an RVP of 13.5 for the month of April, it also incorporates the ASTM specifications, one of which relates the time not to the month of delivery of the gasoline but to the month of its expected use, here the month of May. The ASTM specifications require an RVP of 11.5 for use in May. Agway’s in-house specifications for the month of April call for an 11.5 RVP. Agway’s April 1980 report from Linden, which we have found lacking in evidentiary linkage, would show an RVP of 12.3, a violation of the ASTM requirement of 11.5 were the expected use to be in May.
The Davis gas chromatography analysis revealed that the Arthur Harris gasoline contained an unusually high proportion of propane which, propane being on the low end of the hydrocarbon weight scale, would produce a volatility out of the ordinary. The analysis also showed a trace of olefin. Because this is on the heavier end of the hydrocarbon scale, it would make no distinctive contribution to volatility, but its presence in the Harris gasoline was unusual. Olefin adds nothing to the quality of gasoline but, since it is in demand as a separate product, it is refined out of gasoline and sold separately. The presence of the olefin and the excessive propane lead the Davis Chemical Company to believe that there was a possible malfunction in the refining process, whether it be of Texas City Refining or of one of the refineries whose product was commingled in the Colonial Pipeline.
If the injured Daniel Harris be considered a remote user of Agway’s gasoline, not having been a party to its purchase, it *433 makes little difference whether the cause of action is one in strict liability or for a breach of an implied warranty; they are one and the same (Victorson v Bock Laundry Mach. Co, 37 NY2d 395). The Appellate Division, Fourth Department, however, in a case in which implied warranty could not be sustained for a statutory reason no longer pertinent, permitted repleader in strict liability, but stated that as to a remote user implied warranty has replaced strict liability through “the evolutionary decisions of the Court of Appeals” (Dickey v Lockport Prestress, 52 AD2d 1075, 1076).
Agway breached the implied warranty of the gasoline’s fitness for a particular purpose (UCC 2-315). It had reason to know that the gasoline delivered on April 24th would be used in Arthur Harris’ tractor for spring plowing in May. It had reason to know that Arthur Harris was relying on its skill or judgment to provide a gasoline fit for that purpose. The gasoline was unfit by reason of its excessive volatility.
Were it not liable under implied warranty, Agway would come under strict liability. There it must have been shown that the gasoline was defective or unreasonably dangerous (Balm v Triumph Corp., 33 NY2d 151, 158) and that the defective or unreasonably dangerous product was a substantial factor in bringing about Daniel Harris’ injuries (Micallef v Miehle Co., 39 NY2d 376, 385, 386, supra). We find the gasoline was defective in its excessive propane and it was unreasonably dangerous in having a RVP of 13.9 for its expected time of use. We find that the volatility so brought about was a substantial factor in the geysering of the gasoline and in the causation of the injuries to Daniel Harris.
Agway contented itself by merely being a conduit through which the gasoline passed on its route from the refinery to the user. It had a greater obligation. As a retail seller of gasoline it will be held liable in negligence if it knew or had reason to know of latent danger in the use of its gasoline and failed to give warning of it (McLaughlin v Mine Safety Appliances Co., 11 NY2d 62, 68; Young v Elmira Tr. Mix, 52 AD2d 202; Solazzo v Occhino, 4 Misc 2d 630; cf. Bichler v Willing, 58 AD2d 331). It will also be held liable if it failed to discover any defect that an ordinary inspection would disclose (Naples v City of New York, 34 AD2d 577). We find Agway guilty of negligence on both counts.
The sale of winter grade gasoline for use during a time appropriate only to summer grade constituted the sale of a product of latent danger. Agway was aware of the winter/sum *434 mer distinction and it failed its obligation to warn its customers of the difference and the danger of the higher volatility product.
Agway did no testing of its gasoline. It relied on “the integrity of the industry”. It was unaware of any testing, other than for color, gravity, and distillation, at the Linden storage. It was unaware of any testing, except for gravity and color, by the Colonial Pipeline. It received no tests from the Texas City Refinery. It received no volatility test reports from the Buckeye Pipeline during the January to June 1980 period. While a vendor buying from a reputable manufacturer has a reasonable ground for believing the product free of defect, and has no duty to inspect (Outwater v Miller, 3 AD2d 670; Schwartz v Macrose Lbr. & Trim Co., 50 Misc 2d 547, 557), we find, nonetheless, that Agway breached a duty to inspect. It did not know whether the gasoline shipped to it for use in May was summer or winter grade. It did not know that the gasoline shipped to it was in violation of its in-house regulations, its purchasing agreement, and ASTM specifications. Common business sense would suggest that Agway test to assure that it was getting the product it paid for. Finally, it had no reason to rely on the Texas City product in light of the product being commingled in the Colonial Pipeline with the product of other refineries. Agway’s acceptance of the integrity of the industry as its standard operating procedure cannot shield it from its own negligence (Mastoloni & Sons v United States Postal Serv., 546 F Supp 415, 420).
AS TO ARTHUR HARRIS
Arthur Harris, the father of Daniel, knew that the operator’s manual supplied with the tractor warned against removing the fuel cap from the fuel tank while the engine was running or hot and that loosening the cap to let pressure escape was not a safe practice but was a fire hazard.
On April 8, 1980, International Harvester sent White’s Farm Supply a quantity of decals for distribution to tractor owners. They were to be adhered to the gasoline tanks next to the fuel caps. The decal cautioned in large and prominent lettering
“warning
“a fuel fire can burn you”
It further instructed against opening the fuel cap with the engine running or hot. White’s made the decals part of a counter display together with a poster asking, “how safe are you”, accompanied by a supply of pamphlets entitled “New Facts about Fuels”. It was stipulated that Arthur Harris was handed a decal at White’s place of business less than two weeks before the *435 accident. It was never put on the tractor. The son Daniel was never told about the decal or its warning.
Arthur Harris was his son’s sole teacher of tractor operation. The son was never told not to remove a fuel cap with the engine running or hot. The son was never told of the warning in the operator’s manual. To the contrary, Daniel Harris had seen his father, while the engine was running, refuel the tractor and loosen the cap to relieve pressure. The father had also seen the son, like his father, loosen the fuel cap with the tractor running and hot.
From these facts we conclude that Arthur Harris was negligent in permitting and, indeed, directing his son to operate the tractor without passing on to the son the dangers of which he himself had had adequate warning, which dangers, realized, caused the son’s injuries.
AS TO APPORTIONMENT
Based on the foregoing, we apportion liability as follows: International Harvester 35%, Agway 35%, Arthur Harris 20%, White’s Farm Supply 10%.