No. 68,665

RYAN M. PATTON and KATHY PATTON STRUNK, *Plaintiffs*, v.
HUTCHINSON WIL-RICH MANUFACTURING COMPANY, *et al.*,
*Defendants*.

(861 P.2d 1299)

Opinion filed October 29, 1993.

*Gary D. McCallister,* of Davis, Wright, Unrein, Hummer & McCallister, of Topeka, argued the cause, and *Anne L. Baker,* of the same firm, and *James A. Patton,* of Hiawatha, were with him on the briefs for plaintiffs.

*Daniel M. Dibble,* of Lathrop & Norquist, of Kansas City, Missouri, argued the cause, and *Brian J. Madden,* of the same firm, and *William G. Howard,* of the same firm, of Overland Park, were with him on the briefs for defendants.

*Donald Patterson,* of Fisher, Patterson, Sayler & Smith, of Topeka, was on the brief for *amicus curiae* Kansas Product Liability Advisory Council.

*Lynn R. Johnson* and *Bobbie R. Bailey,* of Shamberg, Johnson, Bergman & Morris, P.C., of Overland Park, were on the brief for *amicus curiae* Kansas Trial Lawyers Association.

*Kevin M. Reynolds,* of Whitfield & Eddy, P.L.C., of Des Moines, Iowa, and *Donald C. Bollard, III,* of Sherman, Taft, and Bangert, of Leawood, were on the brief for *amicus curiae* Defense Research Institute, Inc.

*Lawton M. Nuss* and *Donald G. Reinsch,* of Clark, Mize & Linville, Chartered, of Salina, were on the brief for *amicus curiae* Kansas Association of Defense Counsel.

The opinion of the court was delivered by

SIX, J.: This is a first impression products liability case. Four questions concerning a manufacturer's post-sale duties to warn of danger incident to use of its product have been certified by the United States District Court for the District of Kansas. Our jurisdiction is under K.S.A. 60-3201 (authority to answer certified questions).

## The Certified Questions

The four certified questions are:

I. Whether Kansas products liability law recognizes a continuing duty to warn theory of liability requiring manufacturers who learn of a danger incident to the use of their products after the sale of those products to warn ultimate consumers who purchased the products prior to the time the manufacturers learned of the potential danger through warnings disseminated to the manufacturers' retailers who have continuing contact with the consumers.

II. Whether Kansas products liability law recognizes a continuing duty to warn theory of liability requiring manufacturers who learn of a danger incident to the use of their products after the sale of those products to directly warn ultimate consumers who purchased the products prior to the time the manufacturers learned of the potential danger.

III. Whether Kansas products liability law places a duty to retrofit upon manufacturers who learn of a potential danger incident to the use of their products after the products have been sold.

IV. Whether Kansas products liability law places a duty to recall upon manufacturers who learn of a potential danger incident to the use of their products after the products have been sold.

## Answers to the Certified Questions

Because of the infinite variety of products marketed in this state, the following answers are inexorably linked to and amplified by the corresponding portions of the opinion.

We answer the four certified questions as follows:

I. A qualified yes.

II. A qualified yes.

III. No.

## IV. No.

The federal court memorandum and order certifying the four questions contains the following statement of facts:

### Facts

"The case comes before the court pursuant to several product liability claims brought by the plaintiff against the manufacturers and distributors of the Wil-Rich Field Cultivator (the 'cultivator'), which is a piece of heavy farming equipment. Among other claims, the complaint alleges that defendants had a continuing duty to retrofit or recall the cultivator and/or to warn the end user of the cultivator of unreasonably dangerous defects which the defendants discovered to exist in the cultivator after its original sale.

"Plaintiff Ryan Patton's father purchased the cultivator from a Wil-Rich dealer in 1977. The cultivator is 28 feet wide and consists of a main body and two 'wings.' The wings are raised and lowered hydraulically by the use of cylinders attached to each wing and controlled from the cab of the tractor. When fully raised the wings are approximately at a 90 degree angle. When raised, the wings are held up by hydraulic pressure if the cylinders are correctly attached and fully charged. The wings can also be held up by a lock pin which is inserted manually. If the hydraulic cylinders are not properly attached and fully charged, the wing will fall rapidly when the lock pin is removed.

"On April 21, 1990, Ryan Patton was changing a hydraulic wing lift cylinder on the cultivator. The wings were fully raised and pinned up by the lock pin. Patton finished changing the cylinder and proceeded to remove the lock pin on the right wing. He did so by standing directly under the raised right wing of the cultivator and pushing up the wing. This relieved pressure on the lock pin and Patton proceeded to pull it out. When he did so the wing fell on him, causing him serious injury."

Patton's claims as stated by the certifying court are:

"[D]efendants were subject under Kansas law to a continuing duty to warn plaintiff of dangers discovered by defendants after the date of the sale of the cultivator, and that defendants breached this duty by failing to warn plaintiff of the potentially dangerous condition of the cultivator. Plaintiff also contends that defendants were aware of a retrofit program that had been instituted by John Deere on similarly designed cultivators due to the potential for injuries such as were sustained by Ryan Patton. Plaintiffs contend that Kansas law placed a duty on defendants to recall or retrofit the cultivator once the dangerous condition was discovered, and that defendants breached this duty by failing to implement a program to recall or retrofit the cultivator."

The case is before the federal district court on defendant Hutchinson Wil-Rich Manufacturing Company's (HWR) partial motion for summary judgment. HWR submitted a statement of uncon-

troverted facts. Patton countered with a statement of additional uncontroverted facts. HWR responded by addressing the factual statements of the parties: "If these 'facts' were presented at a trial, defendants would dispute the truth of many of them. That is not necessary here. To put this motion in a posture to be granted, defendants assume, solely for purposes of this motion, that all of the material [facts] asserted by plaintiffs are indeed 'facts' and are true."

We also shall assume the truth of the facts advanced by Patton in his response to HWR's partial summary judgment motion. We proceed with our analysis on the basis of the certification order as supplemented by additional uncontroverted and relevant facts gleaned from the record.

Lear Siegler, Inc., an additional defendant, has adopted the arguments advanced by HWR. Other defendants have been named because of an alleged relationship with the original manufacturer. HWR denies successor or other liability on any theory. We assume HWR to be the manufacturer and last seller of the cultivator. The resolution of successor liability and ultimate liability, if any, is the business of the federal district court.

The cultivator received normal scheduled maintenance, and numerous replacement parts were purchased from the authorized dealership between 1977 and the date of the accident. The hydraulic cylinders were repaired by the dealership in September 1987. The dealership kept a list of equipment purchased by its customers. HWR has over the years maintained an organized system for the distribution and sale of its products through its authorized dealership network. The network identifies the name of the dealership, the principals involved in the dealership, and their addresses and phone numbers. HWR utilizes territory managers who call on the dealers on a frequent basis. HWR has written dealer sales and service agreements with its dealers throughout the United States.

Several other individuals have been injured in accidents connected with vertical fold cultivator wings manufactured by HWR. These accidents appear to have occurred as early as 1983. HWR was aware of these accidents. Patton admits that prior to 1977, HWR had no notice of accidents involving cultivator wings falling when the mechanical lock pin on the wing was removed. A sec-

ondary safety wing latch which was developed in 1983 by Deere & Company, one of HWR's competitors, was unknown to cultivator manufacturers in 1976. Similarly, the other safety devices which Patton alleges should have been on the cultivator were unknown to the industry in 1976. Deere & Company instituted a mandatory safety improvement program for all vertical fold 90' field cultivators in October 1983. The Deere retrofit program became known to John Kehrwald, Vice President of Engineering and Manufacturing at HWR, at some point four or five years after it was initiated. Kehrwald recognized his company had problems with the cultivator wings in 1983. Kehrwald indicated that he believed it was an acceptable risk to choose not to retrofit the HWR cultivators.

Patton stated that there was no way to know whether the hydraulic cylinders are fully charged. Consequently, he believed that after installing a new cylinder, it was safe to remove the lockpin on the wings without doing anything more.

There are no warning labels or decals on the wings of the cultivator. The instruction manual neither details the method by which a cylinder should be changed nor mentions hazards. Patton did not receive any warning concerning hazards or safety modifications from either the dealership or HWR.

## HWR's Suggested Specific Issues

HWR and *amici* Kansas Product Liability Advisory Council, The Defense Research Institute, and Kansas Association of Defense Counsel assert that it is essential for us to respond to additional questions which focus on K.S.A. 1992 Supp. 60-513(b) as a statute of repose. HWR and the *amici* contend that Patton's claims have been abolished by the 10-year limitation of 60-513(b).

We decline to entertain the complex inquiries surrounding the impact of K.S.A. 1992 Supp. 60-513(b) on HWR's liability. HWR's suggested additional questions have not been certified. K.S.A. 60-3203 states:

"A certification order shall set forth the questions of law to be answered and a statement of all facts relevant to the questions certified and showing fully the nature of the controversy in which the questions arose."

Additionally, HWR has not pled K.S.A. 1992 Supp. 60-513(b) as an affirmative defense in the federal suit. Although not included

in .the listed affirmative defenses in K.S.A. 1992 Supp. 60-208(c), the statute is an affirmative defense and must be pled. *Baumann v. Excel Industries, Inc.,* 17 Kan. App. 2d 807, 810, 845 P.2d 65, *rev. denied* March 16, 1993. (HWR indicates that when the "stay order" in the instant action is lifted, it will move for summary judgment based on the statute of repose.)

### Patton's Contentions

Patton crafts the following argument: *Wooderson v. Ortho Pharmaceutical Corp.,* 235 Kan. 387, 681 P.2d 1038, *cert. denied* 469 U.S. 965 (1984), provides authority for the view that manufacturers have a continuing duty of reasonable care concerning ethical (prescription) drugs. The *Wooderson* duty to warn has been applied to other products as well. See *State ex rel. Stephan v. GAF Corp.,* 242 Kan. 152, 156-57, 747 P.2d 1326 (1987). See also *Stratton v. Garvey Internat'l, Inc.,* 9 Kan. App. 2d 254, 258, 676 P.2d 1290 (1984) (discusses negligence or strict liability for failure to warn of a dangerous condition in a product). The factual circumstances of the particular relationship are determinative, not the single fact of whether the alleged duty arose before or after sale.

The Kansas Products Liability Act (KPLA), K.S.A. 60-3301 *et seq.,* places limitations on a manufacturer's duty to warn. See K.S.A. 60-3305. Patton responds to the contention of *amicus* Kansas Product Liability Advisory Council that the legislature is the proper forum to create a continuing duty. Patton reasons that the legislature addressed the manufacturer/seller's duty and neither excluded common-law liability nor imposed a time limit on the duty to warn.

Factors recognized by other courts as relevant to the imposition of a post-sale duty to warn are present in the case at bar. In *Comstock v. General Motors Corp.,* 358 Mich. 163, 173-78, 99 N.W.2d 627 (1959), the Michigan Supreme Court focused on the dangerousness of the product, holding that there was a post-sale duty to warn of defects in an automobile braking system. Patton also relies on *Hodder v. Goodyear Tire & Rubber Co.,* 426 N.W.2d 826 (Minn. 1988), *cert. denied* 492 U.S. 926 (1989) (alleged defective truck tire rim), and *Cover v. Cohen,* 61 N.Y.2d 261, 473 N.Y.S.2d 378, 461 N.E.2d 864 (Ct. App. 1984) (alleged

defective throttle spring return in Chevrolet Malibu), which indicate that the post-sale duty to warn is a function of the potential dangerousness of the product.

In the instant action, as in *Wooderson*, the product, although useful and beneficial, posed a potential danger of great harm. Heavy agricultural equipment can rarely be made 100% safe for all foreseeable uses. HWR received feedback concerning injuries caused by the cultivator. HWR marketed its product through an established network, making it relatively easy to notify the retailers and their customers of dangers in the product which were discovered after sale. The use of agricultural equipment renders farming a dangerous occupation.

Although the duty of a post-sale warning may not be present in all cases, HWR had a duty to transmit a warning to authorized dealers who could then pass the message on to consumers. Alternatively, providing notice directly to product owners better insures that those in need of protection will actually receive the information.

Patton is not claiming that the cultivator was not defective when it left HWR's hands and later became defective. Rather, it is Patton's position that the cultivator was dangerous when manufactured. If HWR knew or should have known of the danger at that time, it would have had an obligation to give a warning either under the doctrine of strict liability or under a negligence theory. If the danger in the product which existed at the time of sale had not become known to HWR prior to Patton's injury, his claims would be restricted to these theories applied solely as of the time of sale. However, because HWR acquired knowledge of the cultivator defect and of the risk of danger after sale, its continuing duty to warn was breached when the warning was not given. Patton is not contending that a manufacturer of a product which is considered safe at the time of manufacture, under then current standards, must later warn prior purchasers when safety standards are upgraded.

Patton applies the Restatement (Second) of Torts § 321 (1964) (duty to act when prior conduct is found to be dangerous) and reasons that HWR sold a cultivator which created an unreasonable risk of causing physical injury. After the sale, HWR acquired

knowledge of this risk. It was therefore under a duty to exercise reasonable care to prevent the risk from taking effect.

The duty to recall or retrofit, like the duty to issue a post-sale warning, is encompassed within the continuing duty of reasonable care identified in *Wooderson* and *GAF Corp.* The recall/retrofit obligation does not create a new duty to upgrade products to current ·state of the art. Consequently, the focus of the recall or retrofit cases is on the correction of the defect which existed at the time the product was sold. Recall or retrofit is a means by which a manufacturer can fulfill the continuing duty of reasonable care.

Patton concedes that no Kansas cases directly address the duty to retrofit a dangerous product. The facts of the case at bar demonstrate that (1) the danger of personal injury and death to users of the HWR cultivator was significant; (2) HWR had notice of the danger; (3) HWR knew of the existence of a simple safety device which could have been installed to protect people· who used the cultivator; and (4) the cost to HWR of making the safety package available would not have been significant. In addition to statutory recall obligations, the common law also recognizes retrofit as a means of providing consumer safety.

## HWR's Contentions

The following contentions are advanced by HWR: There is no duty to recall or retrofit the cultivator. If a product is not defective when it is first sold, it does not thereafter become defective by reason of technological improvements or other knowledge gained by the manufacturer. Foreseeability is the litmus test of whether a manufacturer is liable for a product that is defective when it is first sold. *Robbins v. Alberto-Culver Co.,* 210 Kan. 147, 152, 499 P.2d 1080 (1972) (manufacture of dandruff control product allegedly breached implied warranty of fitness). Our decisions are consistent, with foreseeability being the guide for determining liability. *Garst v. General Motors Corp.,* 207 Kan. 2, 20-21, 484 P.2d 47 (1971) (All courts agree a manufacturer is not obligated to adopt features which represent the ultimate in safety or design. One of the most significant factors to be considered is whether others in the field are using the same or a safer design.); *Evangelist v. Bellern Research Corp.,* 199 Kan. 638, 646, 433 P.2d

380 (1967) (The plaintiff must show the product was defective at the time it left the manufacturer's control.); *Jacobson v. Ford Motor Co.*, 199 Kan. 64, 67, 427 P.2d 621 (1967) (No matter what theory of liability is applied, a plaintiff must show the product was defective to recover.).

In *Siruta v. Hesston Corp.*, 232 Kan. 654, 659 P.2d 799 (1983), we held that the cross-examination of defendant's expert regarding design safety changes made in later models of a hay baler was proper. The cross-examination on design safety changes was permitted, not to prove negligence or defect, but to prove feasibility of plaintiff's proposed guard. 232 Kan. at 667. *Siruta* stands for the proposition that whatever has happened in product design since a machine was first sold is neither relevant nor admissible to prove negligence. Patton seeks to prove the existence of cultivator accidents and the development of product safety devices, all after 1976, for the purpose of establishing HWR's culpability. *Siruta* blocks the admission of such evidence.

K.S.A. 1992 Supp. 60-3307 prohibits the admission: (1) of subsequent product improvements, and (2) "for any purpose," not only product design improvements but also later acquired knowledge as to warnings and hazards. The K.S.A. 1992 Supp. 60-3307 operative event is the date when the product was first designed or sold; consequently, what might occur thereafter can have no bearing on the issue of an alleged defect in the product. If it is impermissible to introduce the evidence described in the statute for any purpose, Patton is barred from presenting the evidence he plans to use to create post-sale duties. HWR has never denied the feasibility of warning decals or design changes. Therefore, Patton's proffered evidence is not admissible.

K.S.A. 60-451 (evidence of subsequent remedial measures is inadmissible) supports the view that the legislature intended that product defects be judged at the time when the product leaves the manufacturer's control. K.S.A. 1992 Supp. 60-513(b) creates a statute of repose which runs from the last act giving rise to the cause of action. All other sections of the KPLA establish the date of manufacture or sale as the controlling measuring point. The KPLA expresses the intent of the legislature to have any liability for a defective product fixed when the product "goes out the door" for the first time.

*Wooderson* is distinguishable from the case at bar for two reasons: (1) *Wooderson* pre-dates 60-513(b) and our opinion in *Harding v. K. C. Wall Products, Inc.,* 250 Kan. 655, 831 P.2d 958 (1992); and (2) *Wooderson* should be narrowly applied to the facts peculiar to the manufacture and distribution of ethical drugs.

*Jones v. Hittle Service, Inc.,* 219 Kan. 627, 549 P.2d 1383 (1976), does not support the existence of a continuing duty to warn. HWR concedes *Jones* recognizes that a duty to warn exists, but only as to product defects which may reasonably be foreseen at the time of first sale. 219 Kan. 627, Syl. ¶ 4. The issue of notice of defects to past buyers was not before the court in *GAF Corp.,* and consequently the opinion does not establish a post-sale duty to warn.

We have the power to create new causes of action. However, in the case at bar, the creation of new duties may deprive HWR of a vested property right without due process of law, *i.e.,* HWR's defense under K.S.A. 1992 Supp. 60-513(b). Three of our 1992 decisions dealing with 60-513(b) (*Dobson v. Larkin Homes, Inc.,* 251 Kan. 50, 832 P.2d 345 [1992]; *Admire Bank & Trust v. City of Emporia,* 250 Kan. 688, 829 P.2d 578 [1992]; and *Harding,* 250 Kan. 655) abolish Patton's post-sale continuing duty claims.

Well-made farm implements last a long time. Durability would be perceived by manufacturers as a negative factor if manufacturers were subjected to post-sale duties. The rule of law Patton seeks to have us adopt will stifle technology and suppress product safety improvement. Under Patton's scenario, a manufacturer would be far safer to design a machine intended to wear out in a few years. Replacement would be required more often, and more machines, albeit inferior ones, would be sold. Pride of product design and improvement would become secondary to fear of liability. Farmers and implement manufacturers would both be losers. The preceding rationale was expressed in *Lynch v. McStome & Lincoln Plaza,* 378 Pa. Super. 430, 440-42, 548 A.2d 1276 (1988) (allegedly defective escalator), in refusing to impose a duty to retrofit.

The legislature, in the KPLA, has clearly declared the public policy of the State. The policy is to limit the rights of plaintiffs to recover in product liability suits generally and to judge a product for an alleged defect only when it is first sold.

## Discussion
### The Post-Sale Duty to Warn

In *Wooderson,* we undertook an analysis concerning the duty of a manufacturer of ethical drugs to warn others regarding drug side effects. As long as an ethical drug manufacturer markets a prescription product, it has a duty to warn the medical profession of dangerous side effects of which it knows, has reason to know, or should know. The duty continues as long as the marketing continues. 235 Kan. at 409. We relied on and quoted extensively from three cases (*Lindsay v. Ortho Pharmaceutical Corp.,* 637 F.2d 87 [2d Cir. 1980]; *Ortho Pharmaceutical v. Chapman,* 180 Ind. App. 33, 388 N.E.2d 541 [1979]; *McEwen v. Ortho Pharmaceutical,* 270 Or. 375, 528 P.2d 522 [1974]), all of which involved ethical drug claims against Ortho Pharmaceutical Corporation, the principal defendant in *Wooderson.* 235 Kan. at 400, 402, 405. *Wooderson's* rationale is limited to the ethical drug context.

The expert testimony and exhibits in *Wooderson* disclosed that there was an abundance of information in medical journals published prior to the years when Wooderson was taking Ortho-Novum $1/80$. The information linked the use of oral contraceptives with hemolytic uremic syndrome, malignant hypertension, and acute renal failure. 235 Kan. at 408-09. The abundance of information published prior to the sale to Wooderson presented a fact situation that is different from the case at bar. HWR had no knowledge at the point of sale of any hydraulic cylinder hazard associated with the farm cultivator.

For the differences in the approach taken by federal district court judges in Kansas in referencing *Wooderson* to other products, see *Mason v. Texaco, Inc.,* 741 F. Supp. 1472, 1482 (D. Kan. 1990), *aff'd in part and remanded* 948 F.2d 1546 (1991), *cert. denied* 112 S. Ct. 1941 (1992) (Plaintiff alleged a failure to warn in a products liability action against benzene manufacturer; the court recognized a continuing duty to warn.); *Blackburn, Inc. v. Harnischfeger Corp.,* 773 F. Supp. 296, 301 (D. Kan. 1991) (Crane owner brought negligence and strict liability claims against manufacturer which alleged, among other things, a failure to warn; the court recognized a continuing duty to warn.). But see

*Johnson County Com. College v. National Gypsum*, 733 F. Supp. 1413, 1417 (D. Kan. 1990) (Plaintiff filed suit on negligence and strict liability theory to recover costs associated with the removal of an asbestos-containing plaster product; the court appeared to decline to extend *Wooderson* beyond the ethical drug context.).

Patton contends that the Court of Appeals recognized a post-sale duty to warn in *Stratton v. Garvey Internat'l, Inc.*, 9 Kan. App. 2d 254, 676 P.2d 1290 (1984). However, the opinion addressed the question of the extent of a successor entity's duty to warn of defects in its predecessor's products. *Stratton* held that a successor corporation has a legal obligation to warn when the successor has both knowledge of the defective condition and a sufficient relationship with the predecessor's customers. 9 Kan. App. 2d at 258. Stratton failed to meet this two-pronged burden. Consequently, he was unable to demonstrate that the successor corporation had a duty to warn. 9 Kan. App. 2d at 261.

Patton observes that *GAF Corp.* referenced *Wooderson* in holding that a roofing products manufacturer had a duty to warn or take corrective action rather than continue to ignore recurring defects in its product. 242 Kan. at 156-57. HWR argues that *GAF Corp.* only establishes a duty to warn at the time of sale. *GAF Corp.* is a "knowledge prior to sale" case. GAF had experienced problems with its product five years before it submitted the published specifications upon which the architects relied. 242 Kan. at 153-55. GAF knew its product was defective for the purpose for which it was designed and manufactured when it was sold; consequently, the case is factually dissimilar from the case at bar. 242 Kan. at 157.

The questions certified limit our determination of a continuing duty to warn after sale to an ultimate consumer who purchased the cultivator prior to the time HWR learned of any potential danger. Although the HWR-Patton relationship is distinguishable from those in *Wooderson*, *GAF Corp.*, and *Stratton*, the three cases do not signal rejection of a post-sale duty to warn.

In considering whether HWR may have a duty to warn of product hazards after the point of sale, we choose the label "post-sale" rather than "continuing". The post-sale claim is separate from the warning claim asserted with respect to the point of sale. See *Jones v. Hittle Service, Inc.*, 219 Kan. at 634 (duty to warn

arises only when the supplier "knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied"); Restatement (Second) of Torts § 388[a] (1964). A post-sale warning could not be given at the point of sale because a manufacturer would not have knowledge to give it.

A distinction also should be drawn between a negligence claim and a strict liability claim. A basic negligence concept involves a risk-utility analysis in which the risk inherent in a condition or activity is balanced against the utility of the condition or conduct and the burden necessary to eliminate or reduce the risk. See Restatement (Second) of Torts §§ 291-293 (1964).

Under a negligence theory, the duty to warn may be post sale and is not keyed to the manufacture or sale of the product. The duty to warn under a theory of strict liability exists only at the time the product leaves the manufacturer's control. This distinction reflects the emphasis in strict liability upon the danger of the product rather than the conduct of a manufacturer, *i.e.*, if a product is not rendered unreasonably dangerous by the absence of warnings when it leaves the manufacturer's control, it cannot at some later date become unreasonably dangerous due to the lack of warnings. *Bly v. Otis Elevator Co.*, 713 F.2d 1040, 1045-46 (4th Cir. 1983) (alleged defects in lift truck). See Madden, *The Duty to Warn in Products Liability: Contours and Criticism*, 11 J. Prod. Liab. 103, 170-71 (1988). A negligence analysis is more appropriate than an application of strict liability in the post-sale context. See Dorr, *Defense of Allegations of Post-Sale Duty to Warn* § 9.02, published in The Trial of a Products Liability Case, Southern Methodist U. Products Liability Institute (1982). In the case at bar, Patton has asserted both negligence and strict liability claims.

A variety of courts have found that a manufacturer does not have a post-sale duty to notify product purchasers or users of changes in the state of the art concerning the safe use of the product. *Collins v. Hyster Co.*, 174 Ill. App. 3d 972, 977, 529 N.E.2d 303 (1988), *lv. to app. denied* 124 Ill. 2d 554 (1989) (forklift products liability case) recognized the duty to warn distinction in the defect at sale and new design improvement contexts: "Certainly the law does not contemplate placing the onerous duty on manufacturers to subsequently warn all foreseeable users

of products based on increased design or manufacture expertise that was not present at the time the product left its control." *Lynch v. McStome & Lincoln Plaza,* 378 Pa. Super. at 440-42, considered a manufacturer's duty to retrofit an escalator with a new braking system or to warn the owners of the new design. The court determined that no such duty existed. See *Syrie v. Knoll Intern.*, 748 F.2d 304, 311-12 (5th Cir. 1984) (alleged defective bank teller stool); *Carrizales v. Rheem Mfg. Co., Inc.,* 226 Ill. App. 3d 20, 33-35, 589 N.E.2d 569 (1991), *lv. to app. denied* 146 Ill. 2d 623 (1992) (alleged negligence in failing to warn plaintiff that gasoline vapors should not be brought in close contact with gas-fired hot water heater); *Estate of Kimmel v. Clark Equipment Co.*, 773 F. Supp. 828, 831 (W.D. Va. 1991) (alleged negligence in design of and failure to warn concerning operation of a forklift).

The state of the art may be altered by the development of a more effective safety device. For business reasons, a manufacturer may seek to bring product improvement to the attention of its past customers, and it should be encouraged to do so in a manner that does not underplay important safety developments. See Allee, *Post-Sale Obligations of Product Manufacturers,* 12 Fordham Urb. L.J. 625, 635 (1984). Patton neither requests nor do we impose a requirement that a manufacturer seek out past customers and notify them of changes in the state of the art.

The KPLA became effective July 1, 1981. The KPLA is based on the Model Uniform Product Liability Act, 44 Fed. Reg. 62,714 *et seq.* (1979). The purpose of the Model Act was to consolidate all product liability actions, regardless of theory into one theory of legal liability. 44 Fed. Reg. 62,720. K.S.A. 1992 Supp. 60-3302(c) provides that all legal theories of recovery, *e.g.,* negligence, strict liability, and failure to warn, are to be merged into one legal theory called a "product liability claim."

K.S.A. 60-3304 repeatedly utilizes the phrase "at the time of manufacture". The phrase does not appear in K.S.A. 60-3305. We agree with Patton's reasoning that K.S.A. 60-3305 does not exclude a post-sale duty to warn. The K.S.A. 60-3305 reference is to "any duty on the part of the manufacturer . . . to warn or protect against a danger or hazard which could or did arise in the use or misuse of such product" in "any product liability

claim". We find no statutory limitation nor has HWR cited precedential authority limiting a manufacturer's duty to warn to the point of sale. See *Reed v. Ford Motor Co.*, 679 F. Supp. 873, 878-79 (S.D. Ind. 1988). The three K.S.A. 60-3305 categories which exclude a duty to warn are: (a) warnings related to precautionary conduct that a reasonable user or consumer would take for protection, (b) precautions that a reasonable user or consumer would have taken, and (c) obvious hazards which a reasonable user or consumer should have known. The period beyond "the time of manufacture" is not an excluded category.

*Comstock v. General Motors Corp.*, 358 Mich. 163, 99 N.W.2d 627 (1959), the seminal case upon which Patton relies, held that a manufacturer's duty to warn of a known latent defect exists not only at the time of sale but also when such a defect becomes known to the manufacturer. The *Comstock* facts presented a situation where the defective automobile brake was present at the time of manufacture. The Michigan court limited its holding by observing that: (1) the brake hazard became known to General Motors "shortly after" the car had been put on the market, and (2) the defect was *life threatening*. 358 Mich. at 177-78.

The post-sale duty to warn varies among jurisdictions. In *Cover v. Cohen*, 61 N.Y.2d 261, 275, 473 N.Y.S.2d 378, 461 N.E.2d 864 (Ct. App. 1984), a duty to warn product users of discovered dangers was imposed. See *Hodder v. Goodyear Tire & Rubber Co.*, 426 N.W.2d 826, 833 (Minn. 1988), *cert. denied* 492 U.S. 926 (1989). In *doCanto v. Ametek, Inc.*, 367 Mass. 776, 784-85, 328 N.E.2d 873 (1975) (alleged defective commercial ironer), the Supreme Court of Massachusetts stated: "When the manufacturer of such a machine learns or should have learned of the risk created by its fault, it has a duty to take reasonable steps to warn at least the purchaser of the risk." See also *Smith v. FMC Corp.*, 754 F.2d 873, 877 (10th Cir. 1985) (alleged defective cranes); *Owens-Illinois v. Zenobia*, 325 Md. 420, 446, 601 A.2d 633 (Ct. App. 1992) (asbestos strict products liability case); and *Harris v. Int'l. Harvester*, 127 Misc. 2d 426, 429-30, 486 N.Y.S.2d 600 (S. Ct. 1984) (alleged negligence in connection with design of farm tractor).

Some courts have elected to further limit the scope of the applicable duty to warn to particular contexts. For example, in

*Walton v. Avco Corp.*, 530 Pa. 568, 577-78, 610 A.2d 454 (1992) (*Walton II*, a strict liability case) the court imposed on a helicopter manufacturer a duty to warn owners that a defective part had been incorporated into the helicopter. See also *Walton v. Avco Corp.*, 383 Pa. Super. 518, 531-32, 557 A.2d 372 (1989) (*Walton I*), for the lower court's analysis which draws a distinction between household consumer goods and a manufacturer of a unique product such as the helicopter. *Habecker v. Clark Equipment Co.*, 797 F. Supp. 381, 388 (M.D. Pa. 1992), applied *Walton I* to a strict products liability action concerning a defect in a forklift and suggested:

> "[W]hile forklifts are not common household goods, they are certainly much more prevalent than helicopters. Nearly any business which has a loading dock or a warehouse has a forklift, and it does not stretch the boundaries of imagination to envision frequent inter-business transfers of this type of equipment. Accordingly, with the *Walton[I]* panel's own warning in mind, this court is not willing to extend that doctrine to common business appliances such as forklifts."

See also *Kozlowski v. John E. Smith's Sons Co.*, 87 Wis. 2d 882, 901, 275 N.W.2d 915 (1979) (alleged defective sausage stuffer). The cases which impose a duty to warn in a limited context (*e.g., Walton* and *Kozlowski*) appear to balance cost and practicality considerations.

K.S.A. 1992 Supp. 60-3307(a)(1) renders "[e]vidence of any advancements or changes in . . . knowledge . . . or testing knowledge . . . learned . . . subsequent to the time when the product in issue was . . . manufactured or sold by the manufacturer" inadmissible in a products liability case. Legislative hearings on S.B. 668 (K.S.A. 1992 Supp. 60-3307) included a statement from the President of the Senate, Senator Robert V. Talkington, who supported the bill's passage:

> "I encourage the committee to support a bill which would prohibit the admission into evidence, during court proceedings, of information related to normal advancements or changes in knowledge or techniques of production, design theory, and packaging of products.
> "Normal product changes are a result of the growth of knowledge and not a desire to 'cover-up' design inadequacies. Passage of this measure would not mean victims of poorly designed products would be unable to seek and achieve compensation for injuries sustained from proper use of such products. What S.B. 668 would do is prevent the mere change of a product or

product package being construed in court as an implicit acknowledgement that the 'original' design was defective.

"I urge the committee to support this bill to provide an additional element of fairness in our judicial process and encourage economic development and growth in Kansas." Minutes of Senate Judiciary Committee, March 6, 1986, A-II.

We believe that 60-3307 is an attempt to codify the wide variety of circumstances that may occur under the rule that excludes evidence of subsequent remedial procedures. See *Wheeler v. John Deere Co.*, 862 F.2d 1404, 1410 n.2 (10th Cir. 1988) (farm combine strict product liability case). K.S.A. 1992 Supp. 60-3307 encourages manufacturers to make their products as safe as possible, free from the fear that remedial measures will be used adversely in later litigation. See also K.S.A. 60-451 (relating to subsequent remedial conduct). We view 60-3307 as a "state-of-the-art" statute which prohibits the introduction of post-manufacture remedial measures, except as provided by 60-3307(b) (evidence allowed to impeach a witness after a manufacturer's or seller's express denial of the feasibility of the remedial measure). See *Siruta v. Hesston Corp.*, 232 Kan. 654, 667, 659 P.2d 799 (1983), for our approval of the admissibility of "feasibility" evidence before the enactment of 60-3307. We consider the following to be the operative language in the context of the case at bar: "if such advancements or changes have been made, learned or placed into common use subsequent to the time the product in issue was . . . sold by the manufacturer." K.S.A. 1992 Supp. 60-3307(a)(1). As we understand the facts, HWR had effected no remedial measures between the 1976 sale of the cultivator and Patton's 1990 accident. If we were to accept HWR's view of 60-3307, we would endorse a situation where a manufacturer's knowledge of frequently occurring life-threatening, post-sale hazards in a product free of known hazard at the point of sale would render evidence of those hazards inadmissible when the manufacturer had made no attempt to warn of the hazard.

We recognize a manufacturer's post-sale duty to warn ultimate consumers who purchased the product who can be readily identified or traced when a defect, which originated at the time the product was manufactured and was unforeseeable at the point of sale, is discovered to present a life-threatening hazard. See 3

American Law of Product Liability 3d §§ 32:82, 32:83 (1993); Allee, *Post-Sale Obligations of Product Manufacturers*, 12 Fordham Urb. L. J. at 630 (post-sale duty to warn arises when previously unknown danger becomes known). We agree with the Wisconsin Supreme Court in *Kozlowski* when it observed, after applying a post-sale warning duty to a sausage making machine under a claim of strict liability and negligence:

"We do not in this decision hold that there is an absolute continuing duty, year after year, for all manufacturers to warn of a new safety device which eliminates potential hazards. A sausage stuffer and the nature of that industry bears no similarity to the realities of manufacturing and marketing household goods such as fans, snowblowers or lawn mowers which have become increasingly hazard proof with each succeeding model. It is beyond reason and good judgment to hold a manufacturer responsible for a duty of annually warning of safety hazards on household items, mass produced and used in every American home, when the product is 6 to 35 years old and outdated by some 20 newer models equipped with every imaginable safety innovation known in the state of the art. It would place an unreasonable duty upon these manufacturers if they were required to trace the ownership of each unit sold and warn annually of new safety improvements over a 35 year period." 87 Wis. 2d at 901.

We acknowledge practical problems associated with imposing a post-sale duty to warn. See Schwartz, *The Post-Sale Duty to Warn: Two Unfortunate Forks in the Road to a Reasonable Doctrine*, 58 N.Y.U.L. Rev. 892, 896 (1983). The question of whether such a duty arises in a particular case will depend on the facts of that case. The passage of time from manufacture and initial sale to the discovery of previously unknown hazards may reflect that the product has changed ownership many times. The original purchaser may have moved. The length of product life will vary. What is reasonably prudent post-sale conduct for one manufacturer and one type of product may not be reasonable for another manufacturer of an entirely different type of product. The sale of the farm cultivator was made to Patton's father on a one-time basis 13 years before the injury. What sales records will be available to the manufacturer? Notification by a manufacturer to all prior purchasers of a product may be extremely burdensome, if not impossible. In the case at bar, the manufacturer's retailer has continuing contact with the consumers. We reason that a manufacturer who was unaware of a hazard at the time of sale and

has since acquired knowledge of a life-threatening hazard should not be absolved of all duty to take reasonable steps to warn the ultimate consumer who purchased the product; however, the warning of unforeseeable dangers is neither required nor possible at the time of sale. A manufacturer is to be given a reasonable period of time after discovery of the life-threatening hazard in which to issue any post-sale warning that might reasonably be required.

The imposition of liability upon a manufacturer for inadequately warning an ultimate consumer who purchased the product prior to the time the manufacturer learned of the potential danger regarding the dangers of the product is dependent upon a reasonableness test and the manufacturer's actual or constructive knowledge of the risk. *Johnson v. American Cyanamid Co.*, 239 Kan. 279, 287, 718 P.2d 1318 (1986); see *Richter v. Limax Intern., Inc.*, 822 F. Supp. 1519, 1521 (D. Kan. 1993) (alleged manufacturer's duty to warn users of mini-trampoline about foreseeable dangers associated with the product's use). A post-sale duty to warn does not exist until either actual or constructive knowledge is acquired by the manufacturer concerning a later life-threatening hazard posed by a product when the product is used for its normally intended purpose. The alleged defect in the cultivator was unknown to HWR when it was initially sold. We do not apply a strict liability theory to the post-sale duty to warn. See *American Cyanamid Co.*, 239 Kan. at 287. The cardinal inquiry is, was HWR's post-sale conduct reasonable? The reasonableness standard is flexible. See Allee, *Post-Sale Obligations of Product Manufacturers*, 12 Fordham Urb. L. J. at 631. The type of notice of a problem revealed by product use that will impose a post-sale duty to warn will be a function of the degree of danger which the problem involves and the number of instances reported. Whether a prima facie case has been made for the presence of a post-sale duty will depend on the facts of each case. *Cover*, 61 N.Y.2d at 276. Each plaintiff must make an initial showing that the manufacturer acquired knowledge of a defect present but unknown and unforeseeable at the point of sale and failed to take reasonable action to warn of the defect.

The nature of the post-sale warning and where and to whom it should be given will involve a case-by-case analysis. The analysis

shall include but not be limited to the examination of such factors as: (1) the nature of the harm that may result from use without notice, (2) the likelihood that harm will occur (Does future continuing use of the product create a significant risk of serious harm which can be lessened if a post-sale warning is given?), (3) how many persons are affected, (4) the economic burden on the manufacturer of identifying and contacting current product users (Does the manufacturer have an ongoing relationship with the purchaser or other knowledge of the identity of the owner of the product which provides a practical way of providing a post-sale warning?), (5) the nature of the industry, (6) the type of product involved, (7) the number of units manufactured or sold, and (8) steps taken other than giving of notice to correct the problem. See *Cover*, 61 N.Y.2d at 276-77. The facts may indicate that notice to all ultimate consumers who purchased the product prior to the time the manufacturer learned of a potential danger is unreasonable, if not impossible. Notice to the distributor or retail seller may, in certain contexts, meet the reasonableness standard.

The particular facts may reflect that a lack of notice was not unreasonable and that a reasonable manufacturer under the circumstances would have taken no post-sale action. Knowledge and reasonableness, as determinative factors, will provide an incentive to manufacturers to issue warnings if latent product hazards are discovered after the initial sale and a warning under the circumstances would be reasonable. We cannot fashion a "bright line" rule from a farm cultivator case that applies with interpretative ease to the infinite variety of products that inhabit the marketplace.

Each trial judge will necessarily be required to make a determination as to whether the record presents a fact question as to knowledge and reasonableness whenever a plaintiff's claim of negligent breach of a post-sale duty to warn is alleged. Generally, resolution of the issue of reasonableness, after an initial court determination that the issue is presented, will be one of fact for the jury. The trial judge, in instructing the jury on a post-sale duty to warn, shall utilize the relevant factors referenced herein, including the nature and likelihood of the injury posed by the product, the feasibility and expense of issuing a warning, whether

the warning would be effective, and whether ultimate consumers who purchased the product can be identified.

## Retrofitting and Recall

The answer to certified questions three and four is "no." Patton has provided no statute or case law to support the claim that HWR is subject to a duty to retrofit or recall the cultivator. We reason that product recalls are properly the business of administrative agencies as suggested by the federal statutes that expressly delegate recall authority. Extensive federal recall legislation deals with the post sale obligations of manufacturers of products such as automobiles, consumer products, boats, and medical devices. See Consumer Product Safety Act, 15 U.S.C. § 2064 (1988) (Consumer Product Safety Commission); National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. § 1414 (1988) (Secretary of Transportation); The Radiation Control for Health and Safety Act of 1968, 42 U.S.C. § 263g (1988) (Secretary of Health and Human Services); Safe Medical Devices Act of 1990, 21 U.S.C. § 360h (1988 and Supp. IV; 1992).

The recall issue in Kansas is referenced in *Johnson v. Colt Industries Operating Corp.*, 609 F. Supp. 776, 782 (D. Kan. 1985) (Evidence on a duty to recall was introduced; the court did not instruct the jury that the manufacturer had a duty to recall.). Although the *Johnson* opinion does not precisely indicate what post-sale duties were recognized for manufacturers, the Tenth Circuit on appeal clarified the fact that the district court's approach did not stand for the existence of a duty to recall or retrofit under Kansas law. See *Johnson v. Colt Industries Operating Corp.*, 797 F.2d 1530, 1532 n.1 (10th Cir. 1986).

Courts deal with the business of individual cases grounded on specific facts. The parties' contentions are developed and placed before us with specific facts in mind. The decision to expand a manufacturer's post-sale duty beyond implementing reasonable efforts to warn ultimate consumers who purchased the product of discovered latent life-threatening hazards unforeseeable at the point of sale should be left to administrative agencies and the legislature. See, e.g., *Wallace v. Dorsey Trailers Southeast, Inc.*, 849 F.2d 341, 344 (8th Cir. 1988) (affirming district court's decision not to impose a duty to retrofit an aerial bucket lift in the

absence of a state or federal law requiring the product to be recalled); *Smith v. Firestone Tire & Rubber Co.*, 755 F.2d 129, 135 (8th Cir. 1985); Schwartz, *The Post-Sale Duty to Warn: Two Unfortunate Forks in the Road to a Reasonable Doctrine*, 58 N.Y.U.L. Rev. at 901. These institutions are better able to weigh the benefits and costs involved in locating, recalling, and retro-fitting products.