896 F.Supp. 1071 (1995)
Shane DUFFEE, minor, By and Through guardian and next friend, Rose THORNTON, Plaintiff,
v.
MURRAY OHIO MANUFACTURING CO.; Walmart Stores, Inc.; and Shimano American Inc., Defendants.
No. 94-4022-SAC.
United States District Court, D. Kansas.
July 24, 1995.
*1072 Mark W. Works, Works, Works & Works, P.A., Topeka, KS, for Shane Duffee By and Through Rose Thornton.
Donald Patterson, Fisher, Patterson, Sayler & Smith, Topeka, KS, for Murray Ohio Mfg. Co., and Walmart Stores, Inc.
David E. Larson, Melody L. Nashan, Watson & Marshall L.C., Kansas City, MO, for Shimano American Inc.
Lori L. Yockers, Barnett, Yockers & Renner, P.A., Wakarusa, KS, for Daniel Beser.

MEMORANDUM AND ORDER
CROW, District Judge.
This product liability action comes before the court on the motion for summary judgment brought by the defendant Shimano American Corporation ("Shimano"). (Dk. 152). The plaintiff Shane Duffee, an eleven-year old boy, suffered head injuries when the bicycle he was riding collided with a car at an intersection. Alleging warning, design and manufacturing defects under negligence, strict liability and warranty theories, the plaintiff sued the manufacturer of the bicycle, Murray Ohio Manufacturing Co. ("Murray"), the retail seller of the bicycle, Walmart Stores, Inc. ("Walmart"), and the manufacturer of the coaster brake on the bicycle, Shimano. The plaintiff also sued the driver of the car for negligence.
Shortly after filing this suit, the plaintiff dismissed the defendant car driver. (Dk. 10). In February of this year, the court granted the motions for summary judgment filed by the defendants Murray and Walmart. (Dk. 150); Duffee, By & Through Thornton v. Murray Ohio Mfg., 879 F.Supp. 1078 (D.Kan.1995). Two days after the court filed its summary judgment order, the defendant Shimano filed a motion for summary judgment. (Dk. 152). This is the motion now before the court.
The plaintiff has filed a premature notice of appeal from the court's earlier summary judgment order. (Dk. 151). The district court was not requested and did not enter judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. For this reason, the plaintiff's notice of appeal is premature and does not divest the district court of jurisdiction to decide the defendant Shimano's pending motion for summary judgment.
A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trialwhether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." Id. There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. Matsushita Elec. Indust. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so *1073 weak that the case does not raise a genuine issue of fact." Burnette v. Dow Chemical Co., 849 F.2d 1269, 1273 (10th Cir.1988).
The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1024 (10th Cir.), cert. denied, ___ U.S. ____, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case." Martin v. Nannie and the Newborns, Inc., 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). "`The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.'" Thomas v. International Business Machines, 48 F.3d 478, 484 (10th Cir.1995) (quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the non-moving party. Id. A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. White v. York Intern. Corp., 45 F.3d 357, 363 (10th Cir.1995).
More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed `to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. Windon Third Oil and Gas v. Federal Deposit Ins., 805 F.2d 342, 346 (10th Cir.1986), cert. denied, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).
For its statement of facts, Shimano simply incorporates by reference those submitted by the other defendants in support of their earlier motions. The plaintiff, in turn, incorporates by reference his responses to those statements of facts, as well as, his statement of facts in support of his own motion for summary judgment. Rule 10 of the Federal Rules of Civil Procedure permits: "Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in another motion." Rule 10 does not address whether a party may incorporate statements found in a motion as opposed to a pleading. See Fed. R.Civ.P. 7(a), (b) (Defines "pleadings" and "motion"). Wholesale incorporation of prior motions and memoranda is likely to cause confusion over what arguments and facts are really being argued now. To prevent such confusion, the court typically discourages such practices. In this instance, however, the effect of the parties' incorporation is to make the court's prior statement of uncontroverted facts controlling here. Indeed, neither the plaintiff nor Shimano suggest the court earlier erred in determining those facts. Consequently, for purposes of this motion, the court will accept its prior statement as the uncontroverted facts here. Those relevant facts are as follows:
On February 21, 1992, at approximately 6:50 p.m., almost forty-five minutes after sunset, the plaintiff, Shane Duffee, an eleven-year old boy, and his friend, James Prout, were riding from James's home to Shane's home on their bicycles. Ahead of James, Shane was riding downhill on 26th Street towards the intersection with Clay Street. He did not stop for the stop sign at the intersection. James observed Shane's rear tire lock-up about even with the stop sign. As Shane's skidding bicycle continued through the intersection, he was struck on the left side by the right front bumper of a moving car on Clay Street. Shane was thrown from the bicycle in the direction carried by his forward momentum. Shane allegedly suffered serious injuries including a head injury and brain damage as a result of this accident.
. . . .
For the two months before the accident, Shane rode his bicycle around the neighborhood, to visit friends and to school. After visiting his friend, James Prout, Shane often coasted down 26th Street on *1074 his way home. Shane typically slowed his bicycle down before reaching the intersection with Clay Street, "bunny hopped" the curb, turned right, and rode on the sidewalk along Clay Street. On one or two occasions, Shane went through the 26th Street and Clay Street intersection without stopping at the stop sign. Shane said he had used the brakes often and, with the exception of the accident, had stopped the bicycle when needed. James Prout confirmed Shane's use of the Murray BMX's coaster brakes.
The plaintiffs designated expert, Ronald Wells, a qualified mechanical and metallurgical engineer, testified to certain basic characteristics of operating a bicycle. Riding and stopping a bicycle is a learning process, and experience is the primary teacher. Beginning with balance, the rider with time and experience learns and acquires a "feel" for turning radii and stopping distances under a variety of conditions and circumstances. That "feel" or experience serves the rider in deciding what must be done to operate a bicycle safely. In any given situation, the stopping distance of any bicycle depends on a number of variables, including: the type of brakes (coaster or caliper), the slope on which braking occurs, the operator's weight, the co-efficient of friction of the road surface, the condition of the tires, weather conditions, velocity at the time of braking, and condition of the brakes. Experience is a very important factor in the safe use of any bicycle.
Coaster brakes or foot brakes have been used on bicycles for decades and are commonly accepted in the industry. Under dry weather conditions and with all equipment properly adjusted, a bicycle with caliper brakes has a shorter stopping distance than a bicycle with only a rear coaster brake. There are, however, risks of use unique to the caliper braking system. Among the recognized risks are front wheel lock-up, loss of control during braking, dampness affecting brakes, increased need for repairs and adjustment, and insufficient grip strength to activate brakes.
The Consumer Product Safety Commission ("CPSC"), by regulation, requires foot brakes or coaster brakes to stop a bicycle within fifteen feet when operated at a test speed of at least ten miles per hour by an individual weighing at least one hundred and fifty pounds. 16 C.F.R. §§ 1512.5(c)(1) and 1512.18(e)(3). Shane's bicycle met the CPSC's force test standards and an exemplar model of Shane's bicycle complied with all of the CPSC's mandatory brake standards.
The plaintiff's expert, Ron Wells, opined that Shane's bicycle was unreasonably dangerous simply because it lacked a caliper braking system. Wells reasoned that the caliper system offered a stopping distance nearly one-fourth as long as the coaster system and that it did not materially interfere with function nor materially increase cost. Wells admitted that a designer and manufacturer of a 20" bicycle would consider a variety of information and studies in choosing an appropriate braking system. Wells further conceded that he would expect the designer to have more knowledge and information than that gained from the personal experience of riding bicycles and that learned from talking with a single bicycle dealer. Wells did not use a methodology comparable to that used by a bicycle designer in arriving at his conclusion that the particular bicycle was defectively designed in having only a rear coaster brake system. The defendants' experts employed a methodology which included more of the relevant factors considered by a bicycle designer in choosing a brake system.
879 F.Supp. at 1080-81 (footnote omitted).
In defending against summary judgment, the plaintiff first alleges that Shimano supplied a coaster brake that was unreasonably dangerous. The plaintiff does not offer any evidence to support this bare allegation. His own expert witness, Ronald Wells, Ph.D., found no defect in the brake as manufactured or designed. In response to questions by Shimano's counsel, Wells testified:
Q. With regard to the brake itself, I think I know your opinions about coaster brakes for use on bicycles, but was there any evidence that you saw *1075 of a manufacturing defect in the brake on Shane Duffee's bike?
A. No.
Q. Any evidence that the brake failed to perform in the manner in which it was intended?
A. I have no evidence in that regard.
Q. Just so I can focus in on what your opinions are, we don't have to worry about any opinions from you that the brake itself was improperly manufactured or improperly designed insofar as it is a coaster brake that worked properly under anticipated circumstances; correct?
A. Yes. I don't anticipate saying that as a coaster brake that it was improperly designed or manufactured.
(Wells 7-6-94 Dep. at 181-182). Well's expert report also does not mention any possibility of a manufacturing or design defect in the coaster brake itself. The plaintiff does not direct the court to any evidence suggesting the brake itself was defective in that it lacked a warning. In short, the plaintiff is without proof that the coaster brake was in a defective condition when it left Shimano's hands. See Mays v. Ciba-Geigy Corp., 233 Kan. 38, 54, 661 P.2d 348 (1983).
Unable to prove a defect with expert testimony, the plaintiff resorts to regulatory standards for this critical point. The Kansas Product Liability Act ("KPLA"), K.S.A. 60-3301 et seq., consolidates or merges all theories of legal liability in a products liability action "into one legal theory called a `product liability claim.'" Patton v. Hutchinson Wil-Rich Mfg. Co., 253 Kan. 741, 756, 861 P.2d 1299 (1993) (citing K.S.A. 60-3302(c)). Depending on whether a product passes or flunks the applicable regulatory standards, the KPLA creates corresponding presumptions of nondefectiveness and defectiveness. See K.S.A. 60-3304(a), (b). If the "injurycausing aspect of the product" complies with regulatory standards on performance, "the product shall be deemed not defective by reason of ... performance, ..., unless the claimant proves by a preponderance of the evidence that a reasonably prudent product seller could and would have taken additional precautions." K.S.A. 60-3304(a). On the other hand, if the "injury-causing aspect of the product" does not comply with regulatory standards, then "the product shall be deemed defective unless the product seller proves by a preponderance of the evidence that its failure to comply was a reasonably prudent course of conduct under the circumstances." K.S.A. 60-3304(b). The alleged "injury-causing aspect" of Shane's bike is the coaster brake.
The plaintiff erroneously interprets the CPSC standards on stopping distances for coaster brakes. The CPSC standards for "footbrakes" or coaster brakes appears at 16 C.F.R. § 1512.5(c)(1), as follows:
(1) Stopping distance. Bicycles equipped with footbrakes (except sidewalk bicycles) shall be tested in accordance with the performance test § 1512.18(e)(3), by a rider of at least 68.1 kg (150 lb) weight and shall have a stopping distance of no greater than 4.57 m (15 ft) from an actual test speed of at least 16 km/h (10 mph). If the bicycle has a footbrake only and the equivalent groundspeed of the bicycle is in excess of 24 km/h (15 mph) (in its highest gear ratio at a pedal crank rate of 60 revolutions per minute), the stopping distance shall be 4.57 m (15 ft) from an actual test speed of 24 km/h (15 mph) or greater.
(footnote omitted) (emphasis added).[1] The plaintiff chooses to read this regulatory standard as requiring all bicycles equipped with coaster brakes to stop within fifteen feet regardless of velocity at the time of braking. The fact that the accident occurred here is proof enough for the plaintiff that his coaster brakes failed the regulatory standards.
The plaintiff can find no support for his strained reading of the CPSC's standard. His own expert apparently does not interpret the standard as requiring a bike to stop within fifteen feet regardless of its speed:

*1076 Q. Part of that standard, does that also describe a 15 mile an hour or greater at 15 foot stopping distance?
A. Yes, which I don't really understand how they canit says 15 miles per hour or greater, which is a little bit confusing. That means if you're going 20 miles per hour, you should still stop in 15 feet, if you were to read that directly, but I don't think that's what they mean.
MR. PATTERSON: Fifty miles an hour.
MR. WELLS: Right, could be, but I
(Wells 7-6-94 Dep. at 212). What more Wells said about this is not known to the court, for the plaintiff chose not to submit the subsequent pages from Wells' depositions. From what was submitted, it's apparent that Wells evidently considered the plaintiff's interpretation to be contrary to CPSC's intent and, thus, unreasonable.
The court agrees that "at least 16 km/h (10 mph)" is an awkward phrase in § 1512.5(c)(1). It, however, causes confusion only for those who are willing to ascribe an unreasonable meaning to it. The "at least" modifier does not change the standard so as to require a bike with coaster brakes to stop within fifteen feet regardless of its speed. It simply defies reason to say that the CPSC imposed the same stopping distance for bicycles travelling at any speed. It unreasonably assumes that the CPSC ignored the rudimentary principle that speed affects braking distance. The more reasonable reading is that the standard simply gives the examiner some discretion in choosing a test speed or a margin of error in maintaining the selected test speed. So long as the test speed is "at least" ten miles per hour, it is valid for the test. Any possibility for confusion over the governing test speed is eliminated by the reference in § 1512.5(c)(1) to the test procedure in § 1512.18(e)(3). The latter regulation provides in relevant part: "The stopping distance shall be less than 4.57 m (15 ft) from an actual test speed of 16 km/h (10 mph)." The "at least" phrase does not appear in the latter regulation indicating that the minimum stopping distance standard of fifteen feet was for a bike travelling at the test speed of ten miles per hour. The court rejects as implausible the plaintiffs reading of the CPSC standard.
The plaintiff's other argument fares no better. Noncompliance with CPSC standards is not established by the mere fact that Shane's bike did not stop within fifteen feet at the time of the accident. The plaintiff does not show the actual circumstances of the accident resemble the testing conditions described in the standards. The court in the prior summary judgment order held:
The plaintiff erroneously argues that the accident itself proves the brakes were not in compliance with the regulatory standard. The expert witnesses agree that Shane was travelling in excess of twenty-one miles per hour when he applied the brakes. Therefore, the fact that Shane did not stop within fifteen feet of the stop sign does not demonstrate that his bicycle would not have stopped within fifteen feet had he been traveling at a rate of ten miles per hour. The plaintiff's bald assertion to the contrary is untenable.
879 F.Supp. at 1085. The plaintiff offers no new evidence or analysis that disputes or questions this conclusion. The plaintiff is not entitled to a presumption of defectiveness for the CPSC standard is not as he reads it, and the accident itself does not prove that Shimano failed to comply with the standard. Because the plaintiff cannot prove the coaster brake was defective, Shimano is entitled to summary judgment.
Shimano alternatively seeks summary judgment arguing that the coaster brake actually complied with regulatory standards and that the plaintiff is without proof to rebut the presumption of nondefectiveness. The plaintiff's expert, Ron Wells, testified:
Q. Do you have any evidence, Dr. Wells, that the coaster brake on Shane Duffee's bicycle failed to comply with any published standards?
A. I have no information to the contrary. mean
Q. As far as we know, it complied with all published standards?
A. Yes.
*1077 Wells 7-6-94 Dep. at 183). When the court granted summary judgment for Murray and Walmart, it said:
It is uncontroverted that the brakes on Shane's bike met the CPSC's force test standards. Because Shane's bicycle was damaged in the accident, the experts were not able to test its compliance with CPSC's stopping distance performance standards. Experts on both sides agreed, however, that they observed nothing with Shane's coaster brakes which could have caused a malfunction. An exemplar of the same model of Shane's bicycle did pass the CPSC's stopping distance performance standards. At speeds averaging approximately ten miles per hour, the tested bicycle stopped within eleven feet or, in other words, under the fifteen feet regulatory standard.
879 F.Supp. at 1085. The only reasonable inference to be drawn from the evidence of record is that Shane's coaster brake met CPSC standards. In light of this finding, there is no factual or legal basis for saying that Shimano had a duty to warn that its coaster brakes did not meet regulatory standards.
To defeat Shimano's summary judgment motion, the plaintiff now must rebut the presumption of nondefectiveness with proof that a reasonable product manufacturer would have done more. 879 F.Supp. at 1085. The plaintiff has no proof that Shimano, as the manufacturer and supplier of a component part, should have done more. The plaintiff generally asserts the bike should have been equipped with caliper brakes, but he does not argue that Shimano had any advisory or supervisory role in Murray's design decision to choose coaster brakes over caliper brakes. The plaintiff's expert Wells testified that he did not know whether Shimano "had anything to do with the design of the bicycle." (Wells 7-6-1994 Depo. at 182).
Kansas appellate courts have not directly decided on the legal duty, if any, that a component part manufacturer can be held liable for defects with the final product. In a recent product liability case involving Kansas law, Judge Kelly applied the following rule:
There is no case in Kansas which directly addresses the duty of a component part maker. However, the overwhelming rule from other jurisdictions is that a person who supplies a component subsequently integrated into a finished product by a sophisticated manufacturer is not liable for a failure of that product, so long as the component complies with specifications set by the manufacturer and is not in itself defective or inherently dangerous. (citations omitted).
These cases have concluded that where the component maker supplies a product, which is not by itself dangerous, to a sophisticated manufacturer which has set exacting specifications for the creation of the product, the component maker is not liable in tort to persons injured through the use of the assembled product. "The law does not impose a duty on the manufacturer of parts produced in compliance with specifications provided by an experienced purchaser-user to undertake an independent safety investigation concerning their intended use." Lesnefsky [v. Fischer & Porter Co.,] 527 F.Supp. [951] at 956 [(E.D.Pa.1981)].
Gardner v. Chrysler Corp., No. 91-1496-PFK, 1995 WL 254322, at *3, 1995 U.S.Dist. LEXIS 5877, at *5-*7 (D.Kan. Apr. 5, 1995); see Sperry v. Bauermeister, Inc., 4 F.3d 596, 598 (8th Cir.1993) (Missouri law) (citing Childress v. Gresen Mfg. Co., 888 F.2d 45, 49 (6th Cir.1989) (Michigan law); Koonce v. Quaker Safety Products & Mfg. Co., 798 F.2d 700, 715 (5th Cir.1986) (Texas law); Cropper v. Rego Distribution Center, Inc., 542 F.Supp. 1142, 1156 (D.Del.1982) (Delaware law); and Wright v. Federal Mach. Co., 535 F.Supp. 645, 649 (E.D.Pa.1982) (Pennsylvania law)). The plaintiff comes forth with no evidence showing that Shimano had any actual role in the design of the bicycle. There is no serious question that Murray is an experienced and sophisticated bicycle manufacturer that knows the relative risks of the different braking systems. There is nothing even to suggest that Murray might have relied on Shimano's advice or expertise in designing a brake system for a particular model of bike. Consequently, the plaintiff has no factual or legal basis for claiming that Shimano should *1078 have done something more in assuring that the bicycle was designed with caliper brakes. Shimano is entitled to summary judgment.
IT IS THEREFORE ORDERED that the defendant Shimano's motion for summary judgment (Dk. 152) is granted.
NOTES
[1] The second sentence of the above standard is inapplicable here, for it is uncontroverted that the bicycle at issue does not have a linear velocity of fifteen miles per hour or more when pedaled at the crank rate of sixty revolutions per minute.