Ryan M. PATTON and Kathy Patton Strunk, Plaintiffs–Appellees/Cross–Appellants,

v.

TIC UNITED CORP., a Delaware corporation, Defendant–Appellant/Cross–Appellee.

Implant Device Education Association; The Wichita Area Support Group for the Survivors of Silicone Breast Implants; Kansas Trial Lawyers Association; Colorado Trial Lawyers Association; Defense Research Institute, Inc.; Product Liability Advisory Council, Inc., Amici Curiae.

Nos. 94–3296, 94–3297.

United States Court of Appeals, Tenth Circuit.

Feb. 16, 1996.

1238

Hildy Bowbeer (George W. Soule and Cortney G. Sylvester, with her on the brief), Bowman & Brooke, Minneapolis, Minnesota, for Appellant/Cross–Appellee.

Gary D. McCallister (Brenda L. Head, with him on the brief), Davis, Unrein, Hummer, McCallister & Buck, Topeka, Kansas, and Jerry R. Palmer (L.J. Leatherman, with him on the brief), Palmer & Lowry, Topeka, Kansas, for Appellees/Cross–Appellants.

Andrew Oswald, Oswald, Oswald & Associates, Hutchison, Kansas, and Leland P. Anderson, Sears Anderson & Swanson, Denver, Colorado, for amici curiae Kansas Trial Lawyers Ass'n and Colorado Trial Lawyers Ass'n.

Mark B. Hutton, Wichita, Kansas, for amici curiae Implant Device Education Ass'n and Wichita Area Support Group for the Survivors of Silicone Breast Implants.

Kevin M. Reynolds and Richard J. Kirschman, Whitfield & Eddy, P.L.C., Des Moines, Iowa, for amicus curiae Defense Research Institute, Inc.

Hugh F. Young, Jr., Reston, Virginia, Kenneth S. Geller and H. Thomas Byron III, Mayer, Brown & Platt, Washington, D.C., for amicus curiae Product Liability Advisory Council, Inc.

Before LUCERO and MURPHY, Circuit Judges, and JENKINS *, District Judge.

* The Honorable Bruce S. Jenkins, Senior District Judge, United States District Court for the District of Utah, sitting by designation.

LUCERO, Circuit Judge.

We review appeals from a final judgment in a products liability diversity action. The defendant appeals the jury verdict against it as well as the court's imposition of punitive damages. The plaintiffs, by cross-appeal, challenge the district court's application of a Kansas damage cap, Kan.Stat.Ann. § 60–19a02, to reduce the jury's award of noneconomic damages. We affirm.

### I.

Ryan Patton was raised on his family's farm in Hiawatha, Kansas. His father purchased a Wil–Rich vertical wing cultivator in 1977. The 23–foot–wide cultivator has two eight-foot-long wings which can be lifted to a 90–degree angle and locked in position for ease of transport or storage. The wings are lowered for use. A hydraulic system is used to lift, lower, or steady the wings. Manually-inserted safety pins lock the wings in an upright position. When the pins are removed, hydraulic pressure alone keeps the 2000–pound wings erect.

Patton knew how to replace the hydraulic cylinder used to raise and lower the wings of the cultivator. When first attached, a new hydraulic cylinder is not charged. To insure that the cylinder will support a wing, the operator must cycle the machine to make sure that the hydraulic system is fully charged before removing the safety pin. The operating instructions did not state how to insure that the hydraulic system was properly charged or warn that the wings should not be in an upright position when replacing the cylinder. The only warning on the machine relating to the hydraulic wings read: "Pull wing pins before lowering wings."

In April, 1990 Patton and Kenneth Clements, a farm employee, set out to change the hydraulic cylinder on the cultivator. Because the day was cool and rainy, the pair decided to work inside the machine shed. The shed was too small to permit the wings to be fully lowered while changing the cylinder. Clements attached a new cylinder to the mainframe and hydraulic lines. Patton retracted the cylinder to make sure that the wings were fully raised. He then pulled the hydraulic lever for several more seconds, believing that this would fully charge the hydraulic cylinder. Unaware that the cylinder was in fact not completely charged, he stood under the wing and attempted to pull the wing pin. He encountered pressure or "binding" on the pin, as he had many times before. Although he knew that one possible cause of binding was that the cylinder was not charged, he had no way to verify his belief that he had fully charged the cylinder. He pushed up on the wing and pulled the pin. The wing fell, pinned Patton to the ground, and severed his spine.

The cultivator that injured Patton was manufactured by Wil–Rich, Inc., at its factory in Wahpeton, North Dakota. Between 1981 and 1987 the assets and stock of Wil–Rich were transferred among a number of entities through merger, acquisition, and reorganization. In 1987, a wholly owned subsidiary of defendant TIC United Corp. (TIC) purchased the assets, business, goodwill and trade name of the former Wil–Rich, Inc. The subsidiary merged with its parent, TIC, in 1993. TIC continued to operate the Wahpeton facility and market cultivators under the name "Wil–Rich."

Plaintiffs sued TIC and various of its predecessors in federal district court, alleging that the original design was defective because it encouraged operators to stand under the cultivator wing when they removed the safety pin, making it likely that they would be severely injured in the event of hydraulic failure. They also argued that, as a successor to the Wil–Rich, Inc. product line, TIC incurred various duties when it learned of accidents of the type that injured Patton.

The district court certified four questions to the Kansas Supreme Court regarding the extent to which Kansas recognizes a manufacturer's post-sale duties to retrofit, recall, or warn of known defects in its products. *See Patton v. Hutchinson Wil–Rich Mfg. Co.*, 253 Kan. 741, 861 P.2d 1299, 1303–04 (1993) ("*Patton I*"). The Kansas high court recognized a manufacturer's post-sale duty to warn "ultimate consumers who purchased the product who can be readily identified or traced when a defect, which originated at the time the product was manufactured and was

unforeseeable at the point of sale, is discovered to present a life threatening hazard." *Id.* 861 P.2d at 1313.

All defendants except TIC settled with the plaintiffs and were dropped from the lawsuit before the case went to the jury. The jury returned a verdict for the plaintiffs. It attributed two percent of the fault for the accident to Patton, two and one half percent to his father, eighteen and one half percent to Lear Siegler, corporate successor to the original manufacturer, and seventy-six percent to TIC. The jury also attributed one percent of the fault to an entity that had briefly owned the Wil–Rich assets. The jury found that Patton had suffered economic damages in the form of future medical expenses totaling $850,501, and that Patton and his mother had incurred medical and renovation expenses of $142,572.17. The jury also found that Patton had suffered noneconomic damages in the amount of $752,781. Pursuant to Kansas' statute capping liability for noneconomic damages in personal injury cases, Kan.Stat.Ann. § 60–19a02(b), the court reduced Patton's award for noneconomic damages to $250,000. The court also entered judgment against TIC for seventy-six percent of the economic damages award. After a hearing, the district court assessed punitive damages against TIC in the amount of $1,000,000. *Patton v. TIC United Corp.,* 859 F.Supp. 509 (D.Kan.1994) (*"Patton II"*). Patton's motion to reinstate the full jury award of noneconomic damages was denied, as were TIC's motions for judgment as a matter of law or, in the alternative, for a new trial. TIC then appealed and Patton cross-appealed.

## II.

TIC's arguments on appeal follow three separate themes: First, the district court should have granted TIC judgment as a matter of law because it had no duty to warn plaintiffs about the cultivator or, alternatively, because the failure to warn was not the proximate cause of Patton's injuries. Second, the district court should have granted its motion for a new trial because the jury's verdict attributing seventy-six percent of fault to TIC was not supported by evidence.

Finally, the district court's award of punitive damages was unsupported by evidence and violated due process.

■■ We review *de novo* the denial of a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Sheets v. Salt Lake County,* 45 F.3d 1383, 1387 (10th Cir.1995). We will reverse if the evidence, viewed in the light most favorable to the nonmoving party, along with all reasonable inferences drawn therefrom, points only towards a verdict for the moving party. *Id.* We review the district court's denial of a motion for a new trial for abuse of discretion. *Id.* at 1390.

### A.

■■ TIC first argues that it had no duty to warn Patton of any dangers because, under Kansas law, a post-sale duty to warn applies only to the manufacturer of the specific cultivator that injured Patton. We review the district court's interpretation of Kansas law *de novo.* *Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1220, 113 L.Ed.2d 190 (1991).

In *Patton I,* the Kansas Supreme Court addressed the post-sale duties of a product's original manufacturer. The court limited its discussion to the certified questions before it, *Patton I,* 861 P.2d at 1306, and left open the possibility that a party other than the original manufacturer could be held liable for a post-sale failure to warn. "The resolution of successor liability and ultimate liability, if any, is the business of the federal district court." *Id.* 861 P.2d at 1305.

The Kansas Court of Appeals held that a "successor entity" bearing no corporate relationship to the original manufacturer may incur a duty to warn if it has knowledge of the defective condition of the predecessor's product, and has a "more than casual" relationship with the customers of the predecessor entity that is an "economic benefit" to the successor. *Stratton v. Garvey Int'l, Inc.,* 9 Kan.App.2d 254, 676 P.2d 1290, 1294 (1984) (affirming judgment for successor because its relationship to its predecessor's customers was too tenuous). We agree with the district court that *Stratton,* alone or read together with *Patton I,* extended a post-sale duty to

warn to TIC. Here, the district court could find both of the *Stratton* requirements. Evidence showed that TIC knew that operators of the Wil–Rich vertical wing cultivator were being seriously injured in accidents like Patton's, and TIC benefitted economically from its relationship with its predecessors' customers through its authorized Wil–Rich dealer network.

■ TIC argues that the elements of the *Stratton* test should have been submitted to the jury, or, alternatively, that plaintiffs abandoned the *Stratton* theory. The case went to the jury on a general verdict form with special interrogatories. *See* Fed. R.Civ.P. 49(b). TIC did not ask the court to instruct the jury on the elements of *Stratton* successor liability, instead stating that the *Stratton* issue was a question of law for the court to resolve. TIC did not submit a jury instruction or verdict form requesting specific findings on the elements of *Stratton.* It did not object to the absence of *Stratton*-type factual findings before the jury was excused. TIC therefore waived this objection. *Kloepfer v. Honda Motor Co.,* 898 F.2d 1452, 1456 (10th Cir.1990).

■ From the record it is clear that plaintiffs relied on the *Stratton* theory, referred to by plaintiffs under that name and as the "product line successor" theory, throughout the trial. The court admitted some evidence for the limited purpose of showing *Stratton*-type liability. At a hearing before trial, counsel for TIC acknowledged that plaintiffs' theory was that "TIC is a successor in the Stratton versus Garvey sense." TIC points to plaintiffs' concession, in post-trial argument over punitive damages, that *Stratton* does not control *Patton I*'s analysis regarding a *manufacturer's* post-sale duty to warn, and interprets that remark as a waiver of plaintiffs' successor liability theory. We do not read counsel's statement, made in an unrelated context, to amount to a waiver or abandonment of plaintiffs' theory of the case.

### B.

■■ Responding to special interrogatories, the jury divided Lear Siegler's fault among the theories of design defect, point-of-sale failure to warn, and post-sale failure to warn. Because Kansas recognizes a post-sale duty to warn only as to hazards unforeseeable at the point of sale, *Patton I,* 861 P.2d at 1313, TIC claims that the jury's determination that Lear Siegler breached a point of sale duty to warn is inconsistent with its finding that TIC was also liable. When reviewing claims that a jury verdict is inconsistent, we must accept any reasonable view of the case that makes the jury's answers consistent. *Palmer v. City of Monticello,* 31 F.3d 1499, 1505 (10th Cir.1994).

The district court reconciled the alleged inconsistency by interpreting the jury's answers as relating to two separate and distinct dangers. The pleadings and evidence raised the issue of whether Lear Siegler breached a point of sale duty to warn users that they should not stand under the cultivator wing, a general risk that was known to the manufacturer at the time of sale. The pleadings and evidence also raised the separate issue of whether TIC breached a post-sale duty to issue a warning specifically tailored to address the danger that befell Patton: An operator might pull the safety pin under a mistaken belief that the hydraulic system would function properly.

Under the theories and evidence presented by plaintiffs, the jury could properly find the original manufacturer negligent for its failure to warn users not to stand under the wing and to apportion fault for such negligence. The jury could also properly apportion fault among the successor entities for the breach of a post-sale duty to warn specifically that the wings should be lowered before any maintenance is performed. Two duties were breached, each partially responsible for the accident. The district court's reconciliation of the jury's answers was reasonable.

### C.

■ TIC next contends that, as a matter of law, its failure to warn could not have caused Patton's injury because plaintiffs proposed no adequate warning and presented no evidence that he would have heeded a warning. In fact, plaintiffs introduced numerous possible warning stickers and language that could have been included in the

owner's manual, along with expert testimony explaining why the proposed warnings would work. Under Kansas law, a manufacturer's failure to provide an adequate warning creates a rebuttable presumption of causation. *Richter v. Limax Int'l, Inc.*, 45 F.3d 1464, 1471–72 (10th Cir.1995). Here, TIC provided no warning at all. While TIC, on cross-examination of Patton, presented some evidence that could show that a warning would have made no difference, there was ample evidence for a jury to reach the opposite conclusion: Because it was not possible to inspect the hydraulic cylinder to determine if it were charged, a warning addressing the risk presented likely would have been heeded. The jury verdict can properly be read as a finding that, whether or not TIC rebutted the presumption of causation, plaintiffs met their burden. *See Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 547, 110 S.Ct. 2535, 2538, 110 L.Ed.2d 492 (1990).

### D.

TIC next claims that the district court erred in denying its motion for a new trial on the ground that the jury's allocation to it of seventy-six percent fault indicated that passion or prejudice influenced the verdict. TIC theorizes that after the other defendants settled, the jury took vengeance on it, the only available defendant, by allocating an indefensibly high percentage of the fault to the company, and argues that the district court abused its discretion by denying its motion for a new trial.

When reviewing an allegation that a jury's verdict was not supported by evidence, we view the record in the light most favorable to the prevailing party. *Oklahoma Federated Gold & Numismatics, Inc. v. Blodgett*, 24 F.3d 136, 142 (10th Cir. 1994). A motion for a new trial on the ground that the verdict is against the weight of the evidence presents a question of fact, not law, and we will not reverse unless the verdict is "clearly, decidedly, or overwhelmingly against the weight of the evidence." *Brown v. McGraw–Edison Co.*, 736 F.2d 609, 616–17 (10th Cir.1984) (quotation omitted).

The Kansas comparative negligence statute, Kan.Stat.Ann. § 60–258a, requires the jury to apportion the fault of those responsible for the injury. *Arredondo v. Duckwall Stores, Inc.*, 227 Kan. 842, 610 P.2d 1107, 1110 (1980); *Brown v. Keill*, 224 Kan. 195, 580 P.2d 867, 874 (1978). "Fault" is not a scientific concept; in apportioning fault, the jury must compare the defendant's behavior to the norm of care and determine the degree to which the defendant deviated from that norm. *See Ingram v. Acands, Inc.*, 977 F.2d 1332, 1341 (9th Cir.1992) (upholding, under Oregon comparative fault statute, allocation of twenty-five percent fault to defendant when plaintiff was exposed to its asbestos products for only three months of his long career as an insulator).

The jury heard testimony that the risk of injury associated with falling cultivator wings could never be completely eliminated, and that no accidents of the type that injured Patton had occurred at the time of purchase of the cultivator. Thus, the jury could find that Lear Siegler could not be expected to issue a warning that would address the danger that ultimately befell Patton. Based on this evidence, the jury was also entitled to find that the defective design and point-of-sale failure to warn contributed to the accident but did not represent as great a departure from the norm of care as TIC's subsequent failure to warn. The jury's division of Lear Siegler's fault, assigning fifteen percent of the total fault to the post-sale breach but only one and one half percent to the point-of-sale breach, implies that the jury found the post-sale failure to warn the more culpable cause of Patton's injuries.

The evidence suggested that TIC had more information about dangers associated with Wil–Rich cultivators than Lear Siegler. TIC employed John Kehrwald as general manager of its Wil–Rich division. Kehrwald had held similar positions with the prior owners of Wil–Rich. He had investigated all accidents involving Wil–Rich vertical wing cultivators and knew of the potential for serious injury. TIC also knew, through due diligence conducted at the time it purchased the Wil–Rich assets, that several suits were pending against Lear Siegler regarding the

same type of accident that occurred here. More accidental injuries came to light after TIC's purchase. Kehrwald, as chief engineer and later general manager of TIC's Wil–Rich division, did not take steps to warn of the evident danger. TIC knew that dealers kept lists of prior purchasers of Wil–Rich equipment. As its primary defense, TIC relied on a brief conversation by Kehrwald with a competitor's employee to conclude that a warning program would not have been effective.

On the evidence, the jury could properly conclude that as time went on, TIC's departure from the standard of care was greater than that of its predecessors. The jury could see a failure to warn in 1990 as far more culpable than a breach of this duty in 1985, during the Lear Siegler era, when only one accident was known to have occurred. Thus, the jury's apportionment of fault was not clearly against the weight of the evidence. The district court did not abuse its discretion in declining to order a new trial.

### E.

▮▮ TIC next claims that the due process guarantees of the United States Constitution forbid imposing punitive damages on a cause of action that had not previously been recognized under Kansas law. The district court rejected the claim, finding that the due process was satisfied because prior Kansas case law gave TIC adequate notice of its duties. *Patton II*, 859 F.Supp. at 512. We review this question of constitutional law *de novo*. *United States v. DeLuna*, 10 F.3d 1529, 1534 (10th Cir.1993).

TIC's position stems from the Kansas Supreme Court's statement that the certified questions regarding the extent of a manufacturer's post-sale duties to warn presented issues of first impression. *Patton I*, 861 P.2d at 1303. TIC contends that imposing punitive damages against it for conduct that had not, until *Patton I*, been considered tortious, is inconsistent with the notice requirement implicit in due process. *See Giaccio v. Pennsylvania*, 382 U.S. 399, 402–03, 86 S.Ct. 518, 520–21, 15 L.Ed.2d 447 (1966) ("a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits.") In short, it is fundamentally unfair to impose punitive damages on a party that had no notice that its behavior was punishable.

In support of its position, TIC cites *Landgraf v. USI Film Products*, — U.S. —, —, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1993), for the proposition that punitive damages cannot constitutionally be applied retroactively. This, however, is not what *Landgraf* held, and the opinion sheds no light on the issue presented here. *Landgraf* addressed the question of whether Congress intended the punitive damages provisions of the Civil Rights Act of 1991 to apply retroactively to cases then pending before the courts. The Court noted that it would not ascribe to Congress the intent to have these provisions imposed retroactively, because to do so would raise constitutional concerns. Before deciding the constitutionality of such a law, the Court "would have to be confronted with a statute that explicitly authorized punitive damages for preenactment conduct. The Civil Rights Act of 1991 contains no such explicit command." *Id.* at —, 114 S.Ct. at 1506. *Landgraf* explicitly leaves open the question of whether there are constitutional limitations on the retroactive application of punitive damage statutes, and focuses its analysis on the unique powers of the legislative branch to upset settled expectations as to what the law requires. *See id.* at —, 114 S.Ct. at 1497. TIC complains of a punitive damage award arising from the application of evolving common law. We must look to other cases for guidance.

The Supreme Court has indicated that punitive damage awards are subject to scrutiny under the Due Process Clause. *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). However, both these recent cases deal primarily with the relationship due process may require between a punitive damages award and the actual damages incurred. They do not specifically address the notice requirement inherent in due process. Earlier in this century, the Supreme Court did hold that due process forbids imposing a civil penalty

where "[t]here was no intentional wrongdoing, no departure from any prescribed or known standard of action, and no reckless conduct." *Southwestern Tel. & Tel. Co. v. Danaher*, 238 U.S. 482, 490, 35 S.Ct. 886, 888, 59 L.Ed. 1419 (1915). *See also Bouie v. City of Columbia*, 378 U.S. 347, 353, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964) (retroactive application of unforeseeable judicial enlargement of criminal statute violated due process).

We glean relevant principles from these Supreme Court opinions. While not directly addressing vagueness challenges to the imposition of punitive damages, *TXO* implicitly recognized the continuing validity of *Danaher*'s due process limitation. *See TXO*, 509 U.S. at 453–54, 113 S.Ct. at 2718 and n. 17 (plurality opinion). Also, in rejecting the defendant's vagueness challenge to a state court's imposition of punitive damages divorced from the amount of the compensatory damages award, the *TXO* plurality reformulated this aspect of due process, stating that "the notice component of the Due Process Clause is satisfied if prior law fairly indicated that a punitive damages award might be imposed in response to egregiously tortious conduct." *Id.* at 465–66, 113 S.Ct. at 2724 (citing *Haslip*, 499 U.S. at 24 n. 12, 111 S.Ct. at 1046 n. 12). *Haslip* itself recognized that due process concerns with notice that punitive damages might be awarded significantly differ from the concern that a party have notice that it violated the law. *Haslip*, 499 U.S. at 24 n. 12, 111 S.Ct. at 1046 n. 12.

■ We conclude from these decisions that the Due Process Clause permits imposing punitive damages if a party has fair notice that its acts were tortious, and if prior law indicates that the defendant's tortious conduct was sufficiently "egregious" to support an award of punitive damages. *Cf. Southwest Forest Indus. v. Sutton*, 868 F.2d 352 (10th Cir.1989) (in response to claim that defendant justifiably relied on the nonrecognition of a common law duty in Kansas, finding that prior law provided defendant with sufficient notice that its conduct violated emerging duties of care and could result in a punitive damages award). Resolving the due process issue thus involves two steps. First,

we must determine whether TIC had sufficient notice that its conduct might be found tortious under Kansas law. Second, we inquire whether TIC had notice that punitive damages could be awarded in Kansas for wanton misconduct.

■ Kansas provides that the common law shall remain in effect absent constitutional or statutory modification. Kan.Stat.Ann. § 77–109. In *Southwest Forest*, we looked to Kansas antiretroactivity principles and held that the policies announced in prior case law were sufficiently broad to provide defendant with notice that its actions would also be found tortious under Kansas common law. 868 F.2d at 354. Though *Southwest Forest* does not address notice under the Due Process Clause, it does establish how to determine whether the extension of Kansas common law duties was fairly indicated in that state's case law.

In arguing that it had no notice that its conduct was tortious, TIC presumes that no cause of action previously existed in Kansas for a successor entity's failure to warn of defects in its predecessor's products. This is incorrect, because the Kansas Court of Appeals had already recognized such a cause of action. *Stratton*, 676 P.2d at 1294. TIC was not an original manufacturer; it was a successor who bought the manufacturer's assets. *Stratton* fairly indicated Kansas' policy that when a successor entity reaches out to the predecessor's customers for economic benefit, risk-benefit analysis favors recognition of a duty. *See id.* 676 P.2d at 1296. Other Kansas cases likewise suggested the existence of post-sale duties to warn. *See Patton II*, 859 F.Supp. at 512 (collecting cases).

While *Patton I* does state that the certified questions presented issues of first impression, 861 P.2d at 1303, the questions involved the steps a manufacturer must take to locate its customers and whether Kansas recognized post-sale duties to retrofit or recall dangerous products. *Id.* 861 P.2d at 1303–04. The opinion noted that there was "no statutory limitation nor … precedential authority" suggesting that Kansas would reject a manufacturer's post-sale duty to warn. *Id.* 861 P.2d at 1311. When TIC decided to forego any warning program regarding de-

fects in the Wil–Rich cultivator, it cannot state that its acts, based on the principles of Kansas common law, represented "no departure from any prescribed or known standard of care." *Danaher*, 238 U.S. at 490, 35 S.Ct. at 888.

The second step of the notice test is also satisfied. During the entire time TIC failed to implement a warning program, Kansas prescribed punitive damages upon a finding of "wanton, willful, fraudulent or malicious conduct." Kan.Stat.Ann. § 60–3702(c). We conclude that prior Kansas law fairly indicated that a "punitive damages award might be imposed in response to egregiously tortious conduct." *TXO*, 509 U.S. at 466, 113 S.Ct. at 2724 (plurality opinion). The award of punitive damages against TIC did not offend due process.

## F.

■■■ Finally, TIC argues that the evidence could not support the jury's finding its behavior wanton. A finding of wanton, willful, fraudulent or malicious conduct is a prerequisite to an award of punitive damages under Kansas law and must be proved by clear and convincing evidence. Kan.Stat. Ann. § 60–3702(c). On the spectrum of culpability, wanton behavior falls between mere negligence and willful misconduct, *Cerretti v. Flint Hills Rural Elec. Coop. Ass'n*, 251 Kan. 347, 837 P.2d 330, 346 (1992), and is found when the wrongdoer realizes the imminence of danger and recklessly disregards or is indifferent to the consequences. *Id.* We reverse only if no reasonable jury could have found upon the record as a whole that TIC acted wantonly. *See Acrey v. American Sheep Indus. Ass'n*, 981 F.2d 1569, 1575 (10th Cir.1992).

Many of the same facts supporting the jury's finding that TIC was seventy-six percent at fault also support the jury's conclusion that its behavior reflected a wanton mental state. TIC was aware of a recurring hazard of surprise hydraulic failure in the use of the vertical wing cultivator. It knew that danger was imminent because, in the absence of warnings, operators were being killed and maimed. Yet it chose to do nothing. A reasonable jury could find that TIC's apparent indifference to the safety of Wil–Rich cultivator operators was "wanton" within the meaning of the statute.

## III.

■■■ Kansas law places a cap of $250,000 on awards for noneconomic loss. Kan.Stat. Ann. § 60–19a02. On cross-appeal, Patton urges this Court to declare this damage cap void, either because it is superseded by § 202 of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12132, or because it denies Ryan Patton equal protection of the law as a disabled person. We review these legal questions *de novo*. *Northern Natural Gas Co. v. Grounds*, 931 F.2d 678, 681 (10th Cir.1991).

### A.

■■■ ADA § 202 provides:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. To the extent feasible, we look to decisions construing the Rehabilitation Act to assist us in interpreting analogous provisions of the ADA. *See Helen L. v. DiDario*, 46 F.3d 325, 330 n. 7 (3d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995). ADA § 202 is violated when a "qualified individual with a disability" is prevented from participating in or benefiting from a public service, program, or activity, by reason of a qualifying disability, regardless of whether the entity intended to discriminate against the disabled person. *See Pushkin v. Regents of the Univ. of Colo.*, 658 F.2d 1372, 1384 (10th Cir.1981) (showing of discriminatory intent not necessary in Rehabilitation Act action alleging denial of access to public program on basis of disability). The language of the statute also states that a violation occurs when a public entity intentionally discriminates against a qualified disabled person, regardless of whether that discrimination occurs in the context of a public service, program, or activity. Patton asserts both types of violation.

■ Patton, a paraplegic, is a "qualified individual with a disability" within the meaning of the ADA. *See* 42 U.S.C. § 12131(2). He alleges that the damage cap amounts to a denial of access to a "service, program or activity" of the State of Kansas by reason of disability. We need express no opinion as to whether a jury determination of noneconomic damages is a state "service, program, or activity" under the ADA because Patton was not denied access to such a determination.

Interpreting the Rehabilitation Act, the Supreme Court has held that a facially neutral governmental restriction does not deny "meaningful access" to the disabled simply because disabled persons are more likely to be affected by it. *Alexander v. Choate,* 469 U.S. 287, 303–04, 105 S.Ct. 712, 721, 83 L.Ed.2d 661 (1985) (holding that a ceiling on the number of inpatient hospital days paid for by Tennessee's Medicaid program did not deny the disabled meaningful access to Medicaid services). Even if the burden of the noneconomic damage cap falls disproportionately on the disabled, *Alexander* requires only that Patton have the same access to a jury determination of damages as everyone else. *Id.* at 303–05, 105 S.Ct. at 721–22. He did. Because the damages limitation applies to all victorious plaintiffs, Patton was not denied access to a jury determination of damages by reason of disability.

Because ADA § 202 prohibits both the denial of access to state services "by reason of disability" and intentional discrimination, the Kansas damage cap may still be invalidated if plaintiffs can demonstrate that it was motivated by discriminatory animus. A state action so motivated does not pass muster under the ADA simply because some non-disabled persons might also be adversely affected by it. We conclude that plaintiffs have presented no evidence of an intent to discriminate.

In support of the intentional discrimination allegation, plaintiffs focus on the following statement of the Kansas Supreme Court regarding the noneconomic damage cap:

> Denying those with the greatest pain and suffering a full remedy in order to ease insurance rates for those who cause injury was considered and approved by a majority of the legislature. The legislature is aware that the cap on noneconomic damages will affect the right to recover by those most severely injured in Kansas.

*Samsel v. Wheeler Transp. Serv., Inc.,* 246 Kan. 336, 789 P.2d 541, 558 (1990) (citation omitted).

*Samsel* does not hold that the state legislature intended to discriminate against persons with disabilities when it passed Kan.Stat. Ann. § 60–19a02. The Kansas legislature was concerned with keeping insurance affordable so that plaintiffs, including the disabled, would be able to find a solvent pocket from which to recover. *See id.* 789 P.2d at 544 (no matter how favorably written to plaintiffs, tort laws cannot secure justice unless deserved compensation is actually paid). The Kansas legislature was concerned with the effect on insurance rates of highly unpredictable noneconomic damage awards. *Id.* 789 P.2d at 552–53. By defining what it considered a sufficient award for noneconomic damages, the Kansas legislature meant to protect defendants from overly sympathetic judges and juries while at the same time protecting plaintiffs from judges who might otherwise reduce awards to less than $250,-000. *Id.* 789 P.2d at 557. The Kansas legislature did not intend to discriminate against the disabled as a class. We affirm the district court's conclusion that Kan.Stat.Ann. § 60–19a02 is not superseded by the ADA.

**B.**

■ In their equal protection claim, plaintiffs argue that Patton is a member of a suspect class composed of persons with disabilities singled out for unfavorable treatment by the Kansas noneconomic damage cap. Plaintiffs and *amici* suggest that Congress, pursuant to its powers under Section 5 of the Fourteenth Amendment, may designate certain groups as suspect classes for the purpose of equal protection analysis. They further maintain that, in passing the ADA, Congress meant to require courts to apply strict scrutiny to legal classifications based on disability, effectively overruling *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

Whether or not this is true, strict scrutiny is inappropriate because Kan.Stat.Ann. § 60–19a02 does not involve a classification based on disability.

As we have already noted, the cap applies to all victorious plaintiffs who seek noneconomic damages. Other circuits have held that damage caps create classifications either of "claimants," *see Davis v. Omitowoju*, 883 F.2d 1155, 1158 (3d Cir.1989), or, in a case remarkably similar to the one before us, "victims with noneconomic losses that exceed $250,000." *Hoffman v. United States*, 767 F.2d 1431, 1435 (9th Cir.1985). *See also Boyd v. Bulala*, 877 F.2d 1191, 1196 (4th Cir.1989). We agree with the Ninth Circuit's formulation of the classification created by noneconomic damage caps.

 Because the Kansas law involves no suspect classification, we review this equal protection claim under the rational basis test. *Nordlinger v. Hahn*, 505 U.S. 1, 8, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992). Under this standard, a statute is presumed to be constitutional and must be upheld if it "rationally further[s] a legitimate state interest." *Id.* 505 U.S. at 8–10, 112 S.Ct. at 2331–32. Kan. Stat.Ann. § 60–19a02 is designed to protect litigants from the unrestrained exercise of judicial discretion to limit damage awards, *Samsel*, 789 P.2d at 557, and to stabilize liability insurance rates, *see id.* 789 P.2d at 544. Its goal is to ensure that successful plaintiffs will actually be able to collect damage awards. *See id.* When a legislature strikes a balance between a tort victim's right to recover noneconomic damages and society's interest in preserving the availability of affordable liability insurance, it is engaging in its fundamental and legitimate role of "structur[ing] and accommodat[ing] 'the burdens and benefits of economic life.'" *Boyd*, 877 F.2d at 1196 (quoting *Duke Power Co. v. Carolina Envtl.Study Group, Inc.*, 438 U.S. 59, 83, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978) (further quotation omitted)). The state interests sought to be advanced by the damage cap are legitimate. Because the $250,000 cap on noneconomic damages rationally furthers the state's interests, we find that Kan.Stat.Ann. § 60–19a02 does not violate the Equal Protection Clause and therefore uphold the district court's denial of plaintiffs' motion to amend or alter judgment.

## CONCLUSION

We have considered the other contentions of the parties and conclude that they lack merit. Because find no error that would require reversal, the judgment of the district court is AFFIRMED.