Genaro **GARAY** and Eva Garay, parents and heirs of Nicholas Garay, deceased, and Ann Case, personal representative and administrator of the estate of Nicholas Garay, Plaintiffs,

v.

**MISSOURI PACIFIC RAILROAD COMPANY, a corporation, Union Pacific Railroad Company, a corporation, and Trinity Industries, Inc., individually and as successor to Pullman–Standard, Inc., and John Doe, Corporation, Inc., unknown manufacturers, Defendants.**

Civil Action No. 96–1127–WEB.

United States District Court,
D. Kansas.

Feb. 13, 1999.

Pedro L. Irigonegaray, Irigonegaray & Associates, Topeka, KS, Robert L. Pottroff, Myers, Pottroff & Ball, Manhattan, KS, Bradley W. Maudlin, Garden City, KS, for Genaro Garay, Eva Garay, Ann Case.

James M. Yeretsky, Gregory F. Maher, Michael J. Smith, Yeretsky & Maher, Kansas City, MO, for Missouri Pacific Railroad, Union Pacific Railroad Co.

Kenneth L. Weltz, Klenda, Mitchell, Austerman & Zuercher, L.L.C., Wichita, KS, Brad W. Schacht, Hugh Q. Gottschalk, Todd A. Fredrickson, Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Denver, CO, for FMC Corp.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

This is a product liability action brought under Kansas law. Plaintiffs allege that the decedent, Nicholas Garay, was killed in an accident involving a defective rail car. The matter is before the court on motions for summary judgment filed by defendant FMC Corporation ("FMC") (Doc. 73) and by defendants Union Pacific Railroad Company and Missouri Pacific Railroad Company ("the railroads") (Doc. 75). The court has reviewed the parties' submissions and the relevant law and is prepared to rule.

### I. Facts.

The following facts are undisputed or stated in the light most favorable to the plaintiffs.[1]

#### A. *Background.*

The defendant FMC manufactured railcar MP715966 in August of 1967. This was the hopper car in which the decedent, Nicholas Garay ("Garay"), died. At the time of Garay's death, the hopper car was owned by defendant Missouri Pacific. Union Pacific owned the rail siding in Sharon Springs, Kansas, where the hopper car was located at the time of Garay's death.

At the time of his death, Garay was an employee of Bean Acres, Inc. He had been hired the week of March 21, 1994. Bean Acres operates a facility that processes pinto beans. It receives shipments of beans by truck, processes them, and ships them out. Garay's primary responsibility during the three weeks he worked at Bean Acres was loading sacks of beans onto boxcars.

Garay was nineteen years old at the time of his death. He was described as a quiet person and a good worker who did as he was told. He had a sixth-grade education. Garay did not speak or read English; he spoke only Spanish.

During Garay's first week working at Bean Acres, he and co-worker Eliseo Perez were helping to load beans into a hopper car. Pl.Resp., Exh. 1 at 33, 39. Garay was inside the car spreading beans to the

---

1. The court notes there are some conflicts in the deposition testimony of Garay's co-workers concerning the sequence of events. In view of the standards governing a motion for summary judgment, the court resolves any such conflicts, as well as any reasonable inferences arising from the evidence, in favor of the plaintiff.

sides of each compartment as beans were being poured into the top of the hopper car. *Id.* at 39. Garay and Perez were told by Jesse Montoya, another co-worker, that they had to do this in order to fit more beans into the car. Perez told Montoya he didn't want to do this because it was kind of. dangerous. *Id.* According to Perez, he told Garay (in Spanish): "I said, as soon as you get to the pile, I said you can get in there and you can start spreading them around, if you get your feet buried about halfway, I said, you are gone. I said, You are going to be knocked down, you can fall down and a whole bunch of beans is going to come and cover you up." Railroad Mem., Exh. 9 at 14–15. Garay just smiled and said it wasn't dangerous at all. *Id.* at 40, 78. Montoya then told them he just wanted to put more beans in the car and that they didn't have to do it, and Garay got out of the car.

When Garay called his mother to tell her he had gotten the job with Bean Acres, he said he was going to be running sacks through a machine that would sew them, and that on occasion they would be sending him to check boxcars. FMC. Mem., Exh. H at 25–26. When she asked whether it was a dangerous place to work in, he answered that the most dangerous part of the job was when he had to get on top of the boxcars. *Id.* at 27. Garay also talked to his brother and mentioned that sometimes beans got moist and would stick to the walls of a hopper car and that he would have to get up on the edge of the car and work with a shovel, and that if anybody fell inside a car there was nothing there they could grab on to, to pull themselves out. *Id.*, Exh. F at 16–17.

### B. *Unloading the Hopper Car.*

Sometime before April 6, 1994, Bean Acres had processed a cargo of beans for shipment on Union Pacific to California. Upon arrival, however, the shipment was rejected due to moisture contamination. Union Pacific returned. the shipment to Bean Acres, hired Bean Acres to reprocess

the beans and, subsequently, sold the beans to Bean Acres for an agreed-upon price. In order to reprocess the beans, Bean Acres had to unload them. It was a relatively rare occurrence for Bean Acres to unload a hopper car. April 6, 1994, was the first time Garay had ever participated in the unloading of a hopper car.

A hopper car is unloaded by opening hatches at the bottom and on top of the car, which permits the cargo to flow out of the bottom. At Bean Acres, employees placed a small conveyor belt under the car, so when the hatches were opened, the belt would take the cargo from under the car to a larger conveyor belt which, in turn, carried the cargo to a waiting truck. Because of the size and speed of the small belt, the hatch at the bottom of the hopper car could not be opened more than five or six inches.

On the morning of April 6, 1994, Garay and three other Bean Acres employees, upon instruction from their supervisor, entered the hopper car through the top hatch to remove by hand a layer of beans, described as a "crust", which had formed on top of the product due to excess moisture. The employees picked up chunks of beans and placed them in buckets for removal from the hopper car. They prepared the truck for unloading and then took their lunch break.

After the conveyor belts were in place, one of the employees opened the bottom hatch. There is evidence in the record that the men encountered some difficulty in getting beans to flow out of the car due to moisture. *See* Pl.Resp. to Railroads, Exh. 1 at 73. Rick Carson, a supervisor at bean Acres, testified that when they first started unloading, wet beans at the bottom clogged the hatch and they had to get a claw hammer to claw the beans loose and get them flowing. Pl.Resp. to Railroads, Exh. 6 at 25–27. Eliseo Perez testified that the beans were coming out slow. *Id.*, Exh. 1 at 73. At some point, Garay entered the hopper car, although it is not entirely unclear when or why. One reasonable in-

ference from the record is that he did so to facilitate the flowing of beans or to make sure they were flowing. Eliseo Perez testified that he and Pondo climbed to the top of the hopper car "to see how the beans was running." FMC Mem., Exh. C at 20. Perez testified that Pondo and Garay were sitting down on the beans inside of the compartment. *Id.* at 20–21; Pl.Resp. to Railroads, Exh. 1 at 72. They were talking. *Id.* Perez asked them if everything was running okay; they said yes. *Id.* at 21. Garay pointed out a little funnel the beans were making as they ran out and asked Perez if he thought it was very fast. Perez said yes. Jesse Montoya then called to Perez to come down and help move the truck. Perez climbed down and was followed by Pondo. Nicholas didn't come down; he was still inside the car. *Id.*

The next anyone knew of Garay was a short time later when a co-worker noticed Garay's tennis shoe sticking out of the opening at the bottom of the hopper car. The co-worker testified that the beans had been draining at a very slow pace, and that at the moment he saw the tennis shoe the beans drained in great quantities. *Id.*, Exh. 3 at 27–28. Garay had been completely buried in the beans. The co-worker found the supervisor, who called emergency services. Rescue and revival efforts, however, were unsuccessful.

Garay died of suffocation. Included in plaintiffs' evidence is the expert opinion of Dr. Jill Gould, M.D. Railroads' Mem., Exh. 14. In Dr. Gould's opinion, plaintiff died of asphyxia caused by "1) occlusion of the airways with beans and debris, 2) mechanical compression of the chest by weight of the beans, and 3) lack of available oxygen for breathing in the confined space." She stated further that Garay "was alive at the time of being entrapped and was actively inhaling foreign material into his respiratory tract." She did not express an opinion as to what caused Garay to be in the hopper car (i.e., whether or not he fell).

Plaintiffs have retained an expert witness, consulting engineer John Sevart, who contends the hopper car was defective in a number of respects. In Sevart's opinion, the hopper car should have been equipped with lanyard (safety line) attachment points, notices calling attention to the attachment points, and grates over its top hatches with access points for entry into the car. Sevart contends the hopper car should have had a written warning identifying the hazard of suffocation. According to Sevart, the railroads should have instructed users of the hopper car (1) not to enter the car and why, (2) about use of lanyards (what type of lanyard to use, how to attach them and the reason for their use), and (3) on means of accelerating unloading without having someone enter the hopper car. Sevart does not contend that these warnings should have been given in Spanish.

## II. Summary Judgment Standards.

The standards governing the consideration of a motion for summary judgment are well established. The Federal Rules of Civil Procedure provide that summary judgment is appropriate when the documentary evidence filed with the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The court must enter summary judgment "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact on its claim(s). Rule 56, however, imposes no requirement on the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323, 106 S.Ct. 2548 (emphasis in original). Once the moving party has properly supported its motion for summary judgment, the nonmoving party may not rest upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial, relying upon the types of evidentiary materials contemplated by Rule 56. Fed. R.Civ.P. 56(e). Each party must demonstrate to the court the existence of contested facts on each claim it will have to prove at trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The court reviews the evidence on summary judgment under the substantive law and based on the evidentiary burden the party will face at trial on the particular claim. *Anderson,* 477 U.S. at 254, 106 S.Ct. 2505.

### III. Discussion.

Plaintiffs contend the defendants are liable under the Kansas Product Liability Act for design defects and warning defects. Plaintiffs also bring a negligence claim against the railroads, contending they were negligent in failing to provide a reasonably safe railcar to Bean Acres, as their shipper and consignee.

#### A. *Preemption.*

■ Defendants first contend that all of plaintiffs' claims are preempted by the Federal Safety Appliance Act ("FSAA"), 49 U.S.C. §§ 20301, *et seq.* The act provides that railcars may be used only if they have certain listed safety features, including automatic couplers, secure sill steps and hand brakes, grab irons and hand-

holds and drawbars at specified heights. § 20302. It is undisputed that the FSAA does not require the safety features or warnings which plaintiffs' expert witness contends should have been included in this hopper car.

■ The question of preemption is basically one of congressional intent. *Barnett Bank v. Nelson,* 517 U.S. 25, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996). If, in enacting a federal statute, Congress intends to set aside state law, then the Supremacy Clause requires courts to disregard the state law. *See id.* Preemption can occur in three ways. First, Congress sometimes puts an express preemption provision in a statute. *Id.* Second, even if there is no such explicit language, state law is nevertheless preempted if the federal statute creates a scheme of regulation "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). And third, state law is preempted if it is in "irreconcilable conflict" with federal law. *Id.*

In this case, the defendants argue both express and pervasive scheme preemption. Both arguments focus on the FSAA and regulations promulgated thereunder. Defendants argue (1) that the statute and regulations pervasively occupy the field of safety equipment on rail cars and (2) that because of the existence of the Railroad Safety Appliance Standards, state law is expressly preempted under 49 U.S.C. § 20106, which states in relevant part:

A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.

The word "covering" is a restrictive term that means substantially subsuming the subject matter. *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). The defen-

dant correctly notes that the Supreme Court has, on more than one occasion, stated that the FSAA does preempt state law. *Gilvary v. Cuyahoga Valley Ry. Co.*, 292 U.S. 57, 60–61, 54 S.Ct. 573, 78 L.Ed. 1123 (1934) ("So far as the safety equipment of such vehicles is concerned, these acts operate to exclude state regulation whether consistent, complementary, additional, or otherwise."); *Pennsylvania R. Co. v. Public Service Comm'n of Commonwealth of Pennsylvania*, 250 U.S. 566, 569, 40 S.Ct. 36, 63 L.Ed. 1142 (1919) ("[R]egulation by the paramount authority has gone so far that the statute of Pennsylvania cannot impose the additional obligation in issue here.").

However, these cases, and other cases holding preemption applicable, involved state regulations of safety equipment actually mentioned in federal regulations. *Gilvary*, 292 U.S. at 58, 54 S.Ct. 573 (automatic couplers); *Pennsylvania R. Co.*, 250 U.S. at 567, 40 S.Ct. 36 (platforms on end cars). *See also Ouellette v. Union Tank Car Co.*, 902 F.Supp. 5, 10 (D.Mass.1995) (placement of handholds held to be a matter substantially subsumed by the FSAA). In other cases, the Supreme Court has suggested that the preemptive effect of the Safety Appliance Act extends only to the types of equipment listed in the statute. In *Atlantic Coast Line Railroad Co. v. State of Georgia*, 234 U.S. 280, 34 S.Ct. 829, 58 L.Ed. 1312 (1914), the Court held that a Georgia statute requiring headlights on locomotives was not preempted by the FSAA because the act did not "provide regulations for locomotive headlights." *Id.* at 293, 34 S.Ct. 829. *See also Napier v. Atlantic Coast Line R. Co.*, 272 U.S. 605, 611, 47 S.Ct. 207, 71 L.Ed. 432 (1926) ("Does the legislation of Congress manifest the intention to occupy the entire field of regulating locomotive equipment? Obviously it did not do so by the Safety Appliance Act, since its requirements are specific.").

■ The FSAA and its regulations do not provide a definition of "safety appliance," but rather contain "a strikingly specific laundry list" of required equipment for each type of rail car. *Jordan v. Southern Ry. Co.*, 970 F.2d 1350, 1352 (4th Cir.1992). Although the Act applies to these specific types of equipment, "[n]o other device, however necessary for safety, falls within its reach." *Id.* at 1353. The court thus concludes that the FSAA does not subsume the entire field of devices which could be deemed safety equipment, but only the subject of those devices which are listed in the statute. Because the FSAA does not list devices such as lanyard attachment points or grates on hopper cars, the plaintiffs' defect and negligence claims in this case are not preempted. Similarly, plaintiffs' warning claims are not preempted by 49 C.F.R. §§ 301 and 303. The stenciling required under those sections merely identifies the car by owner, number, built date, and the letter "R" to signify a restricted car. 49 C.F.R. §§ 301 & 303. The regulations do not require or address whether any warnings must appear on the car. Therefore, it does not subsume the subject of warnings, and the plaintiffs' claim is not preempted.

## B. *Issues Under the Kansas Product Liability Act.*

■ Defendants next contend there is no evidence that any act or omission on their part caused or contributed to Garay's death. They correctly point out that the mere fact that Garay died while using the hopper car is insufficient to establish causation. The railroads argue "[t]here is no evidence as to how Nicholas came to be inside the hopper car nor whether he exited the hopper car after Pondo saw him and then re-entered the hopper car." Railroads' Mem. at 15. And, "[i]t is unknown whether Nicholas voluntarily entered the hopper car, fell into the hopper car, was forced into the hopper car by a third party, etc." *Id.* In sum, they contend no one knows whether some act of the defendants caused or contributed to Garay's death.

■ Normally, causation is a question of fact for the jury to decide. *McCleary v. Boss,* 24 Kan.App.2d 791, 792, 955 P.2d 127, 128 (1997). It may only be resolved on summary judgment where the facts of the case will support only one conclusion and reasonable minds could not differ as to that conclusion. *Id.* Although there is no direct evidence in this case as to the manner in which Garay became entrapped in the hopper car, there is circumstantial evidence from which a jury could reasonably infer facts to support a finding of causation. *See Mays v. Ciba–Geigy Corp.,* 233 Kan. 38, 661 P.2d 348, 360 (1983) (elements of a claim, including causation, may be proven inferentially, by either direct or circumstantial evidence). For example, a jury could find on this record that the employees were having difficulty getting beans to flow out of the car, that Garay was in the car to facilitate or to check on the flow, and that Garay became entrapped when a section or pile of beans collapsed from under him. If such facts are found, a reasonable jury could likewise conclude that the defendants' failure to have lanyard attachment points and adequate warnings and instructions on the car caused or contributed to Garay's death. *Cf. Patton v. TIC United Corp.,* 77 F.3d 1235 (10th Cir.), *cert. denied,* 518 U.S. 1005, 116 S.Ct. 2525, 135 L.Ed.2d 1049 (1996) (Under Kansas law, manufacturer's failure to provide adequate warning creates a rebuttable presumption of causation). Accordingly, defendants are not entitled to summary judgment on this argument.

The railroads also argue that evidence of causation is lacking under a strict liability theory because none of the design alternatives proposed by plaintiff's expert would have prevented Garay's death. They argue that the evidence suggests Garay did not fall into the hopper car but entered it voluntarily. Because the grate covering design suggested by plaintiff's expert includes access points that allow a person to enter a car, defendants argue that such a covering would not have prevented this accident. They further contend that the lanyard attachment points suggested by the expert would not have prevented the accident because Garay could have removed any lanyard to which he was attached. Moreover, they point out that Bean Acres did not own a lanyard at the time of Garay's death.

These arguments are insufficient to demonstrate an entitlement summary judgment. As the court noted above, causation is ordinarily a question of fact for the jury to decide. Plaintiffs have offered circumstantial evidence as to how Garay became entrapped in the beans, and the issue thus presents a genuine question of fact for the jury to determine from all the evidence. The related questions of whether a grate covering or use of a lanyard would have prevented the accident are likewise genuine issues of fact. The argument that a grate would not have prevented the death presumes that Garay did not fall into the car, but that is a question of fact for the jury to determine. The argument that the failure to have a lanyard attachment could not have caused the accident because Garay "could have removed any lanyard" is similarly unavailing; to obtain summary judgment defendant would have to show beyond dispute that Garay would have removed a safety line. Finally, the fact that Bean Acres did not own a lanyard at the time of the accident is not sufficient. A reasonable jury could find that if lanyard attachments and warnings and instructions had been present on the car, those instructions and warnings would likely have been followed by users of the car. *Cf. Arnold v. Riddell, Inc.,* 882 F.Supp. 979, 996 (D.Kan.1995) (citing *Wooderson v. Ortho Pharmaceutical Corp.,* 235 Kan. 387, 410, 681 P.2d 1038 (1984)) (there is a presumption under Kansas law that an adequate warning will be read and heeded).

■ Defendants make two final arguments with regard to warnings and causation. First, they argue that they had no

duty to warn Garay and that a lack of warnings did not cause his death, because Garay had previously been warned about the dangers of being in the hopper car, including the danger of suffocation. *See* K.S.A. § 60–3305 (no duty to warn with regard to knowledge that a reasonable user of the product did, should, or was required to possess). Viewed in the light most favorable to the plaintiffs, however, the evidence shows that Garay had been warned of a risk of being buried in beans while the car was being loaded, but was not informed and may not have been fully aware of the risk of being sucked under while beans were being unloaded from the bottom of the car.[2] A reasonable jury could conclude there is a significant distinction between these two hazards. The hazard of being knocked over and covered by beans being poured into the top of the hopper car was relatively obvious, and the deposition of Eliseo Perez indicates he warned Garay of that danger on a prior occasion.[3] The hazard to a worker in the car during unloading, however, was not nearly as obvious. In the latter situation, a latent hazard could form underneath the surface of the cargo, unbeknownst to a worker on top. Perez testified that nobody said anything to Garay about it being dangerous to be in there while the car was unloading and it never crossed his mind to do so—despite the fact that he had previously warned Garay about the danger from loading. *See* Pl.Resp. to Railroads, Exh 1 at 80. This accident occurred only shortly after the workers were instructed by their supervisor to enter the hopper car in order to clean out wet beans. And, there is

testimony that during unloading Garay was seen in the car by at least two other co-workers and that neither of them warned him of the danger or told him to get out of the car. A reasonable jury could find on this record that Garay did not and should not necessarily have been expected to have knowledge of the risk from being in the hopper car during unloading. Under these circumstances, the court cannot say as a matter of law that the defendants had no duty to warn.

Second, the defendants contend that any warning on the car would have been printed in English and would not have been heeded by Garay, a Spanish speaker who did not read or speak English. It is no great stretch to infer, however, that a warning in English would, more likely than not, have been read by a co-worker or supervisor and would have been transmitted to the plaintiff. As noted above, there is a presumption under Kansas law that an adequate warning will be read and heeded. *Arnold v. Riddell, Inc., supra.* Under the circumstances, there is a genuine issue of fact as to whether a failure to warn caused or contributed to plaintiff's death.

C. *Negligence Per Se.*

■ Plaintiffs bring a claim of negligence *per se,* alleging that the defendants failed to comply with OSHA standards. The defendant railroads argue that plaintiffs cannot base a negligence *per se* claim on OSHA violations. The court agrees.

Section 653(b)(4) of Title 29 of the U.S.Code provides:

---

**2.** The defendants, relying on Jesus Pondo's deposition testimony, assert that Pondo specifically told Garay "not to be on top of the hopper car because it was dangerous and that he could possibly suffocate and that nobody had any business getting up there." FMC Mem., Exh. F at 81–82. In light of Eliseo Perez' testimony that he saw Garay and Pondo sitting inside the hopper car talking while it was unloading, however, a reasonable jury could conclude that Mr. Pondo did not give Garay any such warning.

**3.** Defendants also contend that Garay was aware of the dangers involved because he was allegedly told a story by Perez about a kid dying in a grain elevator. Railroads' Mem. at 6 (citing Exh. 9 at 16). In addition to being immaterial, defendants have not shown that this alleged fact is uncontroverted. Perez testified that he couldn't remember if Garay was there when he told the story. *Id.* at 16. Nor does the deposition testimony of Montoya, which is also cited by the railroads to support the assertion, show beyond dispute that Garay heard the story. *Id.*, Exh. 8 at 47–48.

Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.

Leaving aside the question of whether the defendants, who were not Garay's employers, had any duty to him under OSHA, the court concludes that § 653(b)(4) precludes a negligence *per se* cause of action based on OSHA violations. In so concluding, the court agrees with Judge Marten of this court, *Williams v. KOPCO, Inc.,* No. 94–1451, 1998 WL 159516 (D.Kan.1998), and the reasoning of Judge Van Bebber in *Martin v. MAPCO Ammonia Pipeline, Inc.,* 866 F.Supp. 1304, 1306 (D.Kan.1994) (discussing admissibility of Pipeline Safety Act, 49 U.S.C. §§ 60101 et seq., which has a provision analogous to § 653(b)(4)). *See also McHargue v. Stokes Div. of Pennwalt Corp.,* 912 F.2d 394, 396 (10th Cir.1990) (in Colorado product liability case, holding that evidence on OSHA standards in general, not admitted for liability or standard of care, was admissible); *Cott v. Peppermint Twist Mgt. Co.,* 253 Kan. 452, 856 P.2d 906 (1993) (upholding admission of OSHA standard as evidence of foreseeability). Therefore, the court grants summary judgment to the defendants on plaintiffs' negligence *per se* claim. The court expresses no opinion at this time as to whether evidence of OSHA standards might be admissible at trial for some purpose other than to establish negligence *per se.*

### D. *Survival Claim.*

■ Finally, the defendants contend that plaintiffs have not put forth evidence to support a survival action under K.S.A. § 60–1801 because there is no evidence that the decedent experienced conscious pain and suffering before his death. *See*

*St. Clair v. Denny,* 245 Kan. 414, 422, 781 P.2d 1043 (1989). Defendants point out that Dr. Jill Gould did not give an opinion in her report that Garay experienced conscious pain and suffering.

Plaintiffs rely on the report of Dr. Gould, who did not examine Garay's body but who did interpret the medical and other evidence already available. According to Dr. Gould, Garay died of asphyxia. In her opinion, Garay "was alive at the time of being entrapped and was actively inhaling foreign material into his respiratory tract." The court concludes that this evidence, combined with testimony that plaintiff was conscious while in the hopper car at some time while the car was being unloaded, and the lack of any evidence that plaintiff was unconscious at any time before his breathing became restricted, *see Mozier v. Parsons,* 852 F.Supp. 925, 932 (D.Kan.1994), is sufficient to create a jury question as to conscious pain and suffering.

The court notes that in other cases where the courts have found insufficient evidence to go forward with a survival claim, the decedents had died from injuries sustained in automobile accidents. *E.g., St. Clair,* 245 Kan. at 415, 781 P.2d 1043; *Cochrane v. Schneider Nat'l Carriers, Inc.,* 968 F.Supp. 613, 614 (D.Kan.1997). In such cases, there is a traumatic impact which can reasonably be expected to cause loss of consciousness at the time of the impact, before any suffering occurs. Therefore, it is impossible to determine without speculation, at what time the decedent lost consciousness. In the case of suffocation, or drowning as involved in *Mozier,* 852 F.Supp. at 927, there typically is no such traumatic impact. Unless the victim has fainted or has been knocked unconscious first, the victim typically loses consciousness only after a period, however brief, of struggling to breathe. In this case, according to Dr. Gould, Garay was actively inhaling foreign material into his respiratory tract. She found no evidence, and there is none elsewhere in the record,

of any trauma or medical problem which would have caused Garay to lose consciousness before his struggle to breathe. It would be reasonable to infer in this case, then, without resorting so speculation, that Garay experienced some degree of conscious pain and suffering before he died. Summary judgment is therefore denied as to this issue.

## IV. Conclusion.

Defendant FMC's motion for summary judgment (Doc. 73) is hereby granted in part and denied in part as set forth above.

Defendant Union Pacific Railroad Company and Missouri Pacific Railroad Company's motion for summary judgment (Doc. 75) is hereby granted in part and denied in part as set forth above.